226 P.3d 482

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Joseph MATTSON, III, Petitioner/Defendant–Appellant.**

**No. 29170.**

Supreme Court of Hawai'i.

March 18, 2010.

Susan L. Arnett (James S. Tabe, on the application), Deputy Public Defenders, for petitioner/defendant-appellant.

Anne K. Clarkin, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

MOON, C.J., NAKAYAMA, and RECKTENWALD, JJ.; ACOBA, J., dissenting, with whom DUFFY, J., joins.

Opinion of the Court by MOON, C.J.

On October 14, 2009, this court accepted a timely application for a writ of certiorari, filed on September 9, 2009, by petitioner/defendant-appellant Joseph Mattson, III, seeking review of the Intermediate Court of Appeals' (ICA) June 12, 2009 judgment on appeal, entered pursuant to its May 21, 2009, summary disposition order (SDO). Therein, the ICA affirmed the Circuit Court of the First Circuit's [1] April 22, 2008 judgment, convicting Mattson of and sen-

---

1. The Honorable Randal K.O. Lee presided.

tencing him for one count of terroristic threatening in the first degree, in violation of HRS §§ 707–715 (1993)[2] and 707–716(1)(e) (Supp.2008).[3] Oral argument was held on December 3, 2009.

Briefly stated, Mattson was arrested and charged based on an incident that occurred between Mattson and his son, Joey Hayashi, on the night of October 13, 2007. During the three-day jury trial, the witnesses testified to conflicting versions of the events that occurred on the night in question, including Mattson, who testified on his own behalf. During its closing argument, respondent/plaintiff-appellant State of Hawai'i (the prosecution) commented on the fact that Mattson had a chance to sit through all of the evidence presented at trial prior to testifying and argued that Mattson knew he had to "make his story gibe [sic]" with the evidence. Mattson was convicted and subsequently appealed, arguing, *inter alia*, that the prosecution's comments during its closing argument violated his federal and state constitutional rights to be present at trial and to testify on his own behalf. The ICA held that the prosecutor's comments were not improper under the federal and state constitutions and affirmed Mattson's conviction.

On application, Mattson contends that the ICA erred in holding that the prosecutor's remarks were not improper under the Hawai'i Constitution. Mattson maintains that such remarks constituted a direct and impermissible attack on his constitutional right to be present at trial and to testify on his own behalf guaranteed by the confrontation clause of the Hawai'i Constitution. Mattson further contends that the ICA erred in concluding that the trial court did not commit plain error when it failed to instruct the jury that Mattson "had a constitutional right to be present throughout the trial and [that] the jury must not draw any unfavorable infer-

ence regarding Mattson's credibility simply on the basis of his presence at trial." Based on the discussion below, we adopt the reasoning of the dissent in *Portuondo v. Agard,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000), and hold that it would be improper, under article I, section 14 of the Hawai'i Constitution for a prosecutor to make generic accusations during closing argument that a defendant has tailored his or her testimony based solely on the defendant's exercise of his or her constitutional right to be present at trial. Accordingly, we also hold that, inasmuch as the prosecutor's closing argument in the instant case did not constitute a "generic accusation" of tailoring based *solely* on Mattson's presence at trial, the prosecutor's comments were not improper under the Hawai'i Constitution. Consequently, we affirm the ICA's judgment on appeal that, in turn, affirmed the trial court's judgment of conviction and sentence.

## I.  BACKGROUND

### A.  Trial Court Proceedings

On October 24, 2007, Mattson was charged—via complaint—with one count of terroristic threatening in the first degree and one count of abuse of family or household members, in violation of HRS § 709–906(1) and (5) (Supp.2008), arising out of an incident that occurred between Mattson and his adult-son, Hayashi, on the night of October 13, 2007. A jury trial commenced on January 9, 2008 and lasted three days, until January 11, 2008. The following evidence was adduced at trial.

### 1.  Prosecution's Case in Chief

#### a.  testimony of Hayashi

Hayashi testified that, around the time of the incident, he had been staying at Mattson's apartment in Wahiawa for about two

---

**2.** HRS § 707–715 provides in relevant part that:
A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:
(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

**3.** HRS § 707–716(1)(e) provides that "[a] person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening ... [w]ith the use of a dangerous instrument."

weeks in order to do a short-term construction job in nearby Haleiwa. Hayashi indicated that, during that time, he was borrowing Mattson's cell phone because he had left his own cell phone at his house in Waianae.

Hayashi stated that, on October 13, 2007, he got off work, went back to Mattson's apartment, and consumed at least two vodka and soda cocktails. When Mattson came home, he and Hayashi watched television while Hayashi waited for his friend, "Josh," to pick him up. Hayashi indicated that Mattson's roommate, Valerie Kumia, was also at the apartment and that, by 9:00 or 9:30 p.m., he, Mattson, and Kumia had all "had a drink or two."

Hayashi explained that, at some point during the evening, Mattson's cell phone rang, but the caller hung up when Mattson answered. The caller identification (ID) on Mattson's cell phone indicated the call was from Hayashi's friend, Josh. Because Mattson apparently heard the sound of a female talking when he answered the phone, Mattson assumed that Josh had a girl with him. At that point, Mattson started yelling and swearing at Hayashi, saying "vulgar" things about his friend, apparently because he believed Josh had hung up on him. Hayashi suspected that it was his girlfriend who had called and that Josh's number appeared because they had called at the same time. Hayashi then grabbed the phone from Mattson and tried to call Josh to determine whether he had called and hung up, but Mattson took the phone away from Hayashi. Hayashi tried to take the phone back when a "scuffle" ensured. Hayashi put Mattson in a headlock. Mattson then screamed for Kumia to come and help him. Kumia came into the room, yelled at Hayashi to let go of Mattson, and Hayashi complied.

According to Hayashi, Mattson then got up, ran to a table behind Hayashi, and grabbed a knife. Mattson opened the knife, came toward Hayashi, and "started slashing it" at him. As Hayashi started backing away from Mattson, he tripped and fell over something on the floor. Mattson swung the knife at Hayashi and missed, stabbing some cardboard behind Hayashi. Mattson continued to swing the knife in front of him and toward Hayashi's legs, coming within a few inches of Hayashi's body. Hayashi testified that, while Mattson was wielding the knife, he swore and said things like, "You tried to kill me, and I'm going to kill you now." Hayashi tried to defend himself and told Mattson to drop the knife and "fight him like a man." At one point, Hayashi grabbed Mattson's arm that was holding the knife, and Mattson punched Hayashi in the face with his free hand.

At that point, Mattson's cell phone rang again, and the caller ID indicated that it was Hayashi's girlfriend. Mattson threw the phone at Hayashi, who answered it, but Mattson continued to stand over him, swearing and saying threatening things about Josh. Just then, the headlights of a vehicle appeared through the window. Mattson stepped away from Hayashi and walked toward the door. Hayashi got up and tried to stop him, believing it was Josh who was outside, but Mattson swung the knife at him again, so Hayashi backed off. Mattson then walked outside. Hayashi looked out the window, noticed that it was not Josh's car, and closed and locked the front door while Mattson was still outside.

Hayashi then ran to Kumia and told her to call the police and lock the back door. Hayashi went into Kumia's room and saw Mattson reaching through an open window with the knife in his hand. According to Hayashi, Mattson had cut the window screen and was attempting to pull out the louvers of the jalousie windows so he could get into the apartment. Kumia came into the room and tried to close the window, but Mattson slashed the knife at her. Hayashi tried to help Kumia, but Mattson continued to slash the knife at both of them.

Hayashi went to the living room and grabbed a gun that he knew was not loaded. He testified that he did not load the gun because he was only trying to scare Mattson and did not intend to hurt or injure him. He also picked up a hatchet before going back to Kumia's room. Once near the open window, Hayashi pointed the gun at Mattson and told him to get away from the window, but Mattson just laughed at Hayashi, telling him he was going to get arrested for using a gun.

Hayashi put the gun down and walked to the window to help Kumia close it, but Mattson continued to swing his knife at them. Hayashi then took the hatchet and started hitting Mattson's hand with the back of the hatchet. After being hit by the hatchet, Mattson pounded on the window, demanding to be let in. Hayashi ran to the living room, and, at that point, the police arrived and placed Mattson under arrest.

On cross-examination, Hayashi admitted that he spoke to Honolulu Police Department (HPD) officers Ashley Gormley and Theodore Merrill, but did not tell them that he had brandished a gun. Hayashi additionally testified that, in a telephone interview with HPD Detective Thomas Smith, he told Detective Smith about the argument with Mattson, the knife, and Mattson's threatening remarks, but did not mention his use of the gun. Hayashi admitted that he did not mention that a gun was involved until he received a second phone call from Detective Smith, specifically asking him if he had pointed a gun at Mattson. Hayashi also admitted on cross-examination that, on the night in question, he was involved in a heated argument with Mattson about the cell phone and that he had used "vulgar" and "hurtful" words toward Mattson. Further, although he initially testified that Mattson did not ask him to leave at any point that evening, he later admitted that Mattson, prior to using the knife, had asked him to leave and that he had refused.

### b. *Kumia's testimony*

Kumia testified that she lived in a one-bedroom apartment with Mattson and that, in October 2007, Hayashi stayed with them for about two weeks. According to Kumia, at around 3:15 p.m. on October 13, 2007, she came into the living room of the apartment and observed Hayashi to be intoxicated, stating that his speech was slurred and he was unsteady on his feet. She also indicated that she did not see Mattson have anything to drink that day.

Kumia testified that, on the night in question, she was outside on the porch smoking a cigarette while Mattson and Hayashi watched television in the living room. Kumia heard Mattson call her name, but she ignored it. She heard Mattson call her name a second time and, because he sounded desperate, she went running into the living room. Once there, she saw Hayashi bent over Mattson, choking him. She started yelling at Hayashi to get off of Mattson. Eventually, Hayashi freed Mattson; however, it took a few seconds before Mattson could move from his bent over position. Upon standing, Mattson walked to a table in the living room and grabbed a pocket knife. He then turned and walked toward Hayashi. Kumia testified that Mattson was holding the knife at his side and that "[i]t wasn't open." However, upon further questioning, she stated, "I did not see it open," but admitted that it could have been open. As Mattson continued to walk toward Hayashi, Kumia observed Hayashi back away from him and fall into the corner of the living room. After Hayashi fell, Mattson continued to stand over him. Kumia observed Hayashi try to get up and yell, "Dad, don't cut me." Kumia testified that, while she was in the room, she did not see Mattson swing the knife at Hayashi.

Kumia stated that, at that point, she left the room and went into her bedroom to call 911 because she wanted to "diffuse the situation."[4] While in her bedroom, she heard

---

4. The 911 tape, which was admitted into evidence, was played for the jury at trial, but was not simultaneously transcribed into the record. Although a written transcript of the call is also not contained in the record, our review of the audio tape reveals that the following conversation transpired between the 911 operator and Kumia:

> 911 OPERATOR: Police Emergency. Hello this is Police.
> KUMIA: I need a police officer, 231C Lehua Street in Wahiawa now.
> 911 OPERATOR: What's going on?

> KUMIA: Um, my roommate pulling [sic] a knife on his son.
> 911 OPERATOR: Where are they at?
> KUMIA: They are in my living room.
> 911 OPERATOR: What kind of knife?
> KUMIA: Um, a pocket knife. I don't know what kind of knife it is.
> 911 OPERATOR: Stay on the line with me, okay?
> KUMIA: Alright. Knock it off Joe [ (referring to Mattson) ]! Joe!
> 911 OPERATOR: Is his name Joe?
> KUMIA: Yes.

loud yelling from both Mattson and Hayashi and specifically heard Mattson yell, "What? You want to choke me out?" As she finished the 911 call, she heard the front door slam. She walked into the living room and heard Mattson outside yelling, "Now you're going to lock me out of my own house?" and asking for his keys and his cell phone.

According to Kumia, Hayashi then told her to lock the back door, and she complied. She testified that she also closed one of the back windows in her bedroom, but Mattson tried to enter through another window in her room. Kumia stated that she noticed that Mattson had cut the screen, but indicated that she did not see him cut it. Kumia explained that she tried to close the window, but Mattson was sticking his arm through the window with the knife in his hand, trying to take out the louvers. As she was trying to close the window, Kumia heard Hayashi in the living room yelling, "Dad, I'm getting my gun. I'm going to shoot you." Kumia also heard Hayashi say that he was loading his gun and testified that, at some point, she went into the living room and saw Hayashi load the gun. Kumia stated that the gun belonged to her, but that the ammunition did not.

After seeing Hayashi load the gun, Kumia went back to her bedroom to, again, try to close the window. Kumia testified that Mattson continued to ask for his keys and his cell phone through the window. At that point, Hayashi came in and pointed the gun at Mattson, but did not fire. Hayashi then approached the window with a hatchet in one hand and the gun in the other and started hitting Mattson's hands with the back of the hatchet. Mattson pulled his hands out of the window, and Kumia and Hayashi were able to close it. Kumia heard the police coming

and heard Hayashi say, "There, dad, there. Now they're coming. Now you're going down."

As previously indicated, Kumia testified on direct examination that she did not see Mattson swing the knife at Hayashi. She admitted, however, that her statement contained in the police report indicates that she saw Mattson swinging the knife at Hayashi and that Mattson was threatening Hayashi while holding the knife. On cross-examination, Kumia testified that, while she was preparing her written statement, the police were "coaching her" and explained that the police interviewed Hayashi and her at the same time. Kumia explained that the differences between her written statement and her testimony at trial resulted from the coaching by the police and having heard Hayashi's version of the events immediately prior to writing the statement.

### c. *testimonies of Officers Gormley and Merrill*

HPD Officers Gormley and Merrill both testified that, on the night of October 13, 2007, they were dispatched to Mattson's home, after being advised that there was an argument and a possible suspect with a knife. Upon arriving at Mattson's apartment, Officer Gormley observed Hayashi come out the front door yelling, "He's got a knife, he's got a knife." Officer Merrill testified that he heard Hayashi say, "He tried to stab me." Both officers testified that, after Hayashi came out of the apartment, they saw Mattson come around the corner of the building without the knife. Officer Gormley ordered Mattson to stop, and Officer Merrill pulled out his duty pistol and pointed it at Mattson. Officer Merrill instructed Mattson to lie

911 OPERATOR: Okay, what is your name?
KUMIA: Val.
911 OPERATOR: What is your last name, Val?
KUMIA: Kumia.
911 OPERATOR: What's Joe's last name?
KUMIA: Mattson.
911 OPERATOR: He still has the knife right?
KUMIA: Yes.
911 OPERATOR: What's the son's name?
KUMIA: Joey.
911 OPERATOR: Same last name, right?

KUMIA: Hayashi.
911 OPERATOR: Okay, and you are in apartment Charlie?
KUMIA: Yes.
911 OPERATOR: Okay. Has Joey been injured at all? Do you need an ambulance?
KUMIA: Um no, I don't think so. They are still arguing.
911 OPERATOR: Alright, officers are on the way.
KUMIA: Okay, thank you.
911 OPERATOR: Thank you.
KUMIA: Bye.

down; Mattson complied and was thereafter detained.

Officer Gormley testified that Hayashi was upset and "shaken up." After calming Hayashi down, she interviewed him about what happened and then interviewed Kumia. Officer Gormley indicated that Hayashi and Kumia also provided written statements. When asked what instructions were given to them regarding the preparation of their written statements, Officer Gormley stated:

I said basically write everything that you just told me, you got to write it in story form. So you can start like on today's date at about what time. And then you're going to write down in chronological order everything that happened. What was said, what was stated, how you felt, everything.

When asked, "Do you at any time tell them exactly what to write[,]" Officer Gormley responded, "No, ma'am."

Officer Gormley further testified, that while she took statements, Officer Merrill went to search for the knife. He subsequently recovered the knife that Mattson had used, stating that it was partially hidden underneath the corner of a washing machine on the rear lanai of Mattson's apartment. Thereafter, the officers arrested Mattson and transported him to the hospital because he had complained of pain and cuts on his hands and fingers.

### d. *testimony of HPD Detective Smith*

Detective Smith testified that, on October 14, 2007, he interviewed Mattson regarding the incident that occurred on October 13, 2007. He further testified that he had recorded the interview and identified the compact disc that contained the interview. Thereafter, Detective Smith's interview with Mattson was played for the jury.

In relevant part, Mattson stated during the interview that, at around 8:00 p.m. on October 13, 2007, he and Hayashi were relaxing and watching television when Mattson's cell phone rang. Because the phone call was from Hayashi's girlfriend, Mattson gave Hayashi the phone. Hayashi argued with the girl on the phone and hung up. The phone rang a couple more times, and Hayashi continued to argue with the person on the phone and started getting "snappy" with Mattson. Mattson told him that if he did not stop being disrespectful, he would have to leave. Mattson stood up and tried to walk past Hayashi to get his roommate, but Hayashi pulled him sideways and placed him in a chokehold. Mattson then yelled for his roommate and felt himself blackout for a few seconds. Mattson stated that, after Hayashi released him, he walked to a table in the living room, grabbed his lighter, and walked back over to Hayashi and yelled at him. He and Hayashi continued to yell at each other, and Mattson again told Hayashi to leave. Mattson explained that he grabbed a lighter from the table in the apartment because, due the commotion of the argument, his mistook his lighter for his keys.

Mattson then saw a car pull up, so he went outside, thinking it was Hayashi's friend coming to pick him up. After Mattson stepped outside, Hayashi locked him out of the apartment. Mattson explained that he intended to leave, but needed his keys and cell phone. He, therefore, went around to the side of the apartment where there was an open window. Mattson explained that he saw a knife outside, picked it up, and started cutting the screen on the open window to try and get inside. After a confrontation with Hayashi where Hayashi hit Mattson's hand, threatened to chop off his fingers, and pointed a gun at him, Mattson gave up and came around the corner of the apartment, where he encountered police who told him to get down on the ground.

### 2. Defendant's Case

Mattson—the sole witness for the defense—testified on his own behalf. He testified that, on October 13, 2007, he arrived at his apartment around 5:00 p.m. with cigarettes for himself, Hayashi, and Kumia. He noticed that Hayashi had been drinking and admitted that he started to drink as well. Mattson testified that he and Hayashi were relaxing and watching television and, at some point, Hayashi passed out next to him. Mattson explained that the cell phone he had loaned to Hayashi rang three separate times. Two of the phone calls were from Hayashi's

girlfriend, and, each time Mattson gave Hayashi the phone, Hayashi raised his voice, argued and swore at the girl, and threw the phone on the ground. Mattson stated that, each time Hayashi threw down the phone, he warned Hayashi not to use bad language and told him not to disrespect Mattson's property by throwing the phone on the ground. Hayashi then asked Mattson if he could call his friend, Josh, who was supposed to pick him up. Mattson gave the phone to Hayashi, who called Josh and asked him why he was not there yet. Mattson testified that, after Hayashi hung up the phone, he returned it "nicely," with no anger or aggression.

Mattson stated that, when the phone rang a third time, Hayashi grabbed for it, but Mattson answered it. Mattson heard a girl on the other end, but the girl did not say anything, so he hung up. According to Mattson, Hayashi became angry with him, yanked the phone out of his hand, and yelled at him for hanging up the phone because he thought it was Josh calling to come pick him up. Hayashi started swearing and calling Mattson a "liar" and other names. Mattson also began to raise his voice and, at some point, told Hayashi to leave the apartment. Hayashi began acting aggressively toward Mattson by standing up, making fighting gestures, and calling him bad names. Hayashi then bent over Mattson and put him in a choke hold, pulling on his neck and squeezing his throat. Mattson yelled for Kumia several times and felt himself blackout for a few seconds. Mattson testified that he did not see Kumia enter the room, and, when he awoke, he saw Hayashi standing over him, still looking "pissed off."

Mattson explained that he thought Hayashi would attempt to jump on him again, so he leaned towards a nearby table (from a kneeling position) and grabbed a knife. He then stood up, yelled at Hayashi, and told him to leave the apartment. Mattson testified that he did not open the knife or swing it at Hayashi. Hayashi continued calling Mattson names and, at some point, lunged forward at Mattson. Mattson started to walk towards Hayashi, but Hayashi backed away from Mattson and ended up tripping over stuff on the floor. Mattson yelled at Hayashi

for breaking his stuff and for disrespecting him. He then walked over to where Hayashi had fallen and reached out to Hayashi to try to help him up. Hayashi was screaming at Mattson not to stab him and flailed his arms and legs so that Mattson was unable to help him up. Mattson again stated that the knife was not open at any time and indicated that, when he was trying to help Hayashi get up from the floor, the knife was closed and in his pocket.

At that point, Mattson saw the headlights of a car and, believing it to be Hayashi's friend, headed towards the front door. Because he thought Hayashi would run outside and make a scene, he told Hayashi to shut up and stay inside. He then walked outside, but realized that the car did not belong to Hayashi's friend. Mattson turned around to go back inside and discovered that Hayashi had locked the front door. He yelled through the door for someone to give him his keys and cell phone so that he could leave.

Mattson testified that, when no one answered, he walked around the back of the building to an open window and again yelled for his keys and cell phone. In an attempt to get inside, Mattson used the knife in his pocket to cut the window screen and reach the louvres to pull them out. Mattson then saw Kumia come to the window, and he repeated his request for his keys and cell phone, but she told him to go away and tried to close it. Mattson closed the knife, but kept his hands in the window area to prevent Kumia from closing it. Mattson stated that, at some point, Hayashi came into the room and told Mattson to go away or he would chop his fingers off. Although Mattson did not see what Hayashi was using, he felt a hard metal object banging on his fingers. Mattson indicated that, as he pulled his hands slightly back from the window, he noticed that Hayashi had a gun pointed at him. He further indicated that he saw Hayashi pull back the hammer of the gun. He claimed that he did not remember whether he told Hayashi that he would get arrested for using a gun. Mattson eventually gave up and walked back around to the front of the apartment. At that point, he encountered

the police, who told him to get down on the ground and handcuffed him.

On cross-examination, Mattson admitted to telling a different version of the story during his interview with Detective Smith. Among other discrepancies, he admitted that he told Detective Smith that he did not have a knife inside the apartment, only a lighter. He also indicated that he "made up" some of the story he told Detective Smith because, at that time, he "only wanted to make the statement that help[ed him]." Also on cross-examination, the prosecution drew attention to the fact that Mattson had the opportunity to sit through the evidence presented at trial. Mattson's counsel objected to this portion of the cross-examination on the basis that such questioning violated Mattson's constitutional rights, but the court overruled the objection.[5]

### 3. Closing Argument

During its closing argument, the prosecution commented on the fact that Mattson had the opportunity to sit through all of the evidence presented at trial. More specifically, the prosecution stated:

> He told you he lied before. *He had a chance to sit through the evidence.* He had to make his story gibe [sic] with what you've heard. What is in evidence. What [Kumia] even had to admit to, because she—... *He sat through the evidence.* There is a 911 tape. [Kumia's] statement. [Hayashi's] statement. Based on all that, he is not telling the truth. All of a sudden he remembered that he grabbed that knife.
>
> This case is about credibility. In order to believe the defendant, you have to be able to answer why didn't [Kumia] just give him the key? Why did [Kumia] lock him out of the house that night? Why lie the day after the event?

(Emphases added.) Mattson objected to this portion of the prosecution's closing argument, indicating that such statements constituted burden shifting.

### 4. Jury's Verdict and Sentencing

The jury returned its verdict on January 14, 2008, finding Mattson guilty of one count of terroristic threatening in the first degree and acquitting Mattson of the remaining charge of abuse of family or household members. On April 22, 2008, Mattson was sentenced to a five-year open term of imprisonment, and the trial court filed the judgment of conviction and sentence on the same day. On May 20, 2008, Mattson timely filed a notice of appeal.

## B. *Appeal Before the ICA*

On direct appeal, Mattson argued that the prosecutor's remark that Mattson had "the unique opportunity to tailor his testimony to match the evidence because he was present in the courtroom during the entire trial" during closing argument "impermissibly infringed" upon his: (1) constitutional right to be present at trial and to testify on his own behalf guaranteed by the Hawai'i Constitution; and (2) federal and state constitutional rights to due process and a fair trial.[6] In his opening brief, Mattson acknowledged that the United States Supreme Court, in *Por-*

5. Specifically, Mattson testified as follows:

Q [By the prosecution] Your memory of what happened, would you agree with me, was better the day after it happened than it is today?

A [By Mattson] Yes and no.

Q How is it not better?

A I didn't get no sleep.

Q Okay. Or is it that you had an opportunity to see what the state does have in evidence?

A No.

Q So you haven't had an opportunity to see what the state has in evidence?

A Only until the [c]ourt.

Q Okay. And you have had the opportunity to sit through the evidence that's been presented?

[By defense counsel]: Objection, Your Honor. That's going into *Maluia.*

THE COURT: Overruled.

Q [By the prosecution] You had the opportunity to sit through the evidence that's been presented?

A [By Mattson] Yes.

Q And you're now testifying in court, right?

A Yes, ma'am.

Q Okay.

6. We observe that Mattson also argued before the ICA that the prosecutor's line of cross-examination regarding Mattson's presence at trial also infringed upon his constitutional rights. However, Mattson does not assert such argument on application and, as such, we do not further address it here.

*tuondo v. Agard,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000), held that a prosecutor's comments regarding a defendant's ability to tailor his testimony based on his presence at trial did not violate a defendant's federal constitutional rights, but argued—as he does on application—that the reasoning of the *Portuondo dissent* is persuasive and should be adopted by this court in order to give criminal defendants greater protection than that afforded under the federal constitution. Additionally, Mattson argued that, "[b]ecause the prosecutor was permitted to imply ... that Mattson's presence during trial permitted Mattson to tailor his testimony to match the evidence," the trial court plainly erred in failing to instruct the jury that Mattson had a constitutional right to be present throughout the whole trial and that the jury must not draw any unfavorable inference regarding Mattson's credibility on the basis of his presence at trial.

In response, the prosecution argued that the *Portuondo* majority should be followed by this court and that, under *Portuondo,* the prosecutor's remarks during closing argument did not violate Mattson's constitutional rights because such remarks were "based entirely upon the evidence" and "reflected [the prosecutor's] legitimate attempt to draw attention to the incredibility of [Mattson's] version of the incident against the testimony of all of the other witnesses." The prosecution recognized that this court is "free to give broader protection under the Hawai'i Constitution than that given by the federal constitution" (citing *State v. Viglielmo,* 105 Hawai'i 197, 211, 95 P.3d 952, 966 (2004)), but argued that Mattson "has not shown in this case that additional protection is warranted." The prosecution further argued that, even assuming the *Portuondo* dissent is adopted, the prosecutor's comments were not improper because they were "narrowly tailored to the specific evidence adduced at trial, including the 911 call[ ], the other witnesses' statements[,] and even [Mattson's] own conflicting statements." With respect to the jury instructions, the prosecution argued that the trial court did not plainly err in failing to give an additional instruction regarding Mattson's right to be present at trial because the instructions given in the instant case,

"when read and considered as a whole, were not prejudicially insufficient, erroneous, inconsistent, or misleading."

The ICA rejected all of Mattson's contentions and held that:

(1) The United States Supreme Court's decision in *Portuondo v. Agard,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000), forecloses Mattson's claim that the prosecutor's argument violated his rights under the U.S. Constitution.

(2) The prosecutor's argument in this case was not improper under the Hawai'i Constitution. *See State v. Apilando,* 79 Hawai'i 128, 142, 900 P.2d 135, 149 (1995) (holding that "when a defendant takes the stand to testify, his or her credibility can be tested in the same manner as any other witness," and therefore, it was not improper for the prosecutor to comment that "because [the defendant] had the highest stake in the outcome of the case, he had the greatest motive to lie").

(3) We decline to conclude that the circuit court committed plain error in failing to instruct the jury, *sua sponte,* that Mattson had a constitutional right to be present throughout trial and the jury must not draw any unfavorable inference regarding Mattson's credibility simply on the basis of his presence at trial.

SDO at 2–3 (brackets in original). Consequently, the ICA affirmed the trial court's judgment of conviction and sentence. *Id.* at 3.

The ICA filed its judgment on appeal on June 12, 2009. Thereafter, this court accepted Mattson's application on October 14, 2009 and heard oral argument on December 3, 2009.

## II. *STANDARD OF REVIEW*

■ "[This court] review[s] questions of constitutional law *de novo,* under the 'right/wrong' standard" and, thus, "exercises [its] own independent constitutional judgment based on the facts of the case." *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citation omitted).

## III. *DISCUSSION*

As previously stated, Mattson contends on application that the ICA erred in holding that the prosecutor's remarks during closing argument were not improper under the Hawai'i Constitution because the statement that Mattson's presence during trial enabled him to tailor his testimony to match the evidence constituted an impermissible and direct attack on Mattson's state constitutional right to be present at trial and to testify on his own behalf. As Mattson recognized on appeal to the ICA, his argument that his constitutional rights were violated hinges entirely on this court's approval and adoption of the reasoning in the *Portuondo* dissent. Indeed, it is clear that, if this court were to follow the holding of the *Portuondo* majority—which held that, because all testifying witnesses should be treated the same, the prosecutor's comments regarding a defendant's ability to tailor his testimony based on his presence throughout trial did *not* violate a defendant's constitutional rights, *Portuondo*, 529 U.S. at 73, 120 S.Ct. 1119,—then Mattson's argument would be wholly without merit. Consequently, we now turn to examine *Portuondo*.

In *Portuondo*, the prosecutor commented on the defendant's presence at trial during closing argument, stating in relevant part that,

> unlike all the other witnesses in this case[,] the defendant has a benefit and the benefit that he has, unlike all the other witnesses, is he gets to sit here and listen to the testimony of all the other witnesses before he testifies.... That gives you a big advantage, doesn't it. You get to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence?

529 U.S. at 63–64, 120 S.Ct. 1119 (internal quotation marks omitted) (ellipses in original) (format altered). The defense counsel objected, claiming that such comments violated the defendant's constitutional right to be present at trial, but the trial court for the state of New York rejected such argument and concluded that the defendant's "presence during the entire trial, and the advantage that this afforded him, may fairly be commented on." *Id.* at 64, 120 S.Ct. 1119 (cita-

tion and internal quotation marks omitted). Following his conviction, the defendant filed a petition for habeas corpus, arguing that the prosecutor's comments violated his Fifth and Sixth Amendment rights to be present at trial and confront his accusers, as well as his Fourteenth Amendment right to due process. *Id.* at 64–65, 120 S.Ct. 1119. The United States District Court for the Eastern District of New York denied his petition in an unpublished order. *Id.* at 65, 120 S.Ct. 1119. On appeal from the denial, a divided panel of the United States Court of Appeals for the Second Circuit (Second Circuit) reversed his conviction, holding that the prosecutor's comments violated the defendant's Fifth, Sixth, and Fourteenth Amendment rights. *Id.*

The Supreme Court granted certiorari and concluded that: (1) the defendant's claims "ha[d] no historical foundation," *id.* at 65, 120 S.Ct. 1119; and (2) "lacking any historical support for the constitutional rights that he asserts, [the defendant] must rely entirely upon our opinion in *Griffin [v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (holding that a prosecutor's comments about a defendant's refusal to testify were improper and unconstitutional)], which 'is a poor analogue ... for several reasons.'" *Id.* at 67, 120 S.Ct. 1119. The *Portuondo* majority went on to distinguish *Griffin*, differentiating between a prosecutor's comment on a defendant's refusal to testify, which the majority determined would impermissibly result in the jury's counting the defendant's silence at trial against him, and a prosecutor's comment on the defendant's *presence at trial*, which the majority stated would merely result in the jury evaluating the credibility of the defendant as a witness—an evaluation that the majority stated was both "natural and irresistible" for the jury to make. *Id.* at 67–68, 120 S.Ct. 1119. The majority further distinguished *Griffin*, stating that "*Griffin* prohibited comments that suggest a defendant's silence is evidence of *guilt*," *id.* at 69, 120 S.Ct. 1119 (emphasis in original) (citations and internal quotation marks omitted), and, by contrast, "the prosecutor's comments in this case ... concerned [the defendant's] *credibility as a witness*, and were therefore in accord with our longstanding rule that[,]

when a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness.'" *Id.* (quoting *Brown v. United States,* 356 U.S. 148, 154, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958)) (emphasis in original). As a result, the *Portuondo* majority concluded that

the principle [the defendant] asks us to adopt here[, *i.e.,* that the prosecution is precluded from commenting on the defendant's presence at trial,] differs from what we adopted in *Griffin* in one or the other of the following respects: *It either prohibits inviting the jury to do what the jury is perfectly entitled to do; or it requires the jury to do what is practically impossible.*

*Id.* at 68, 120 S.Ct. 1119 (emphasis added) (footnote omitted).

The majority additionally rejected the defendant's contention ·that the prosecutor's comments were impermissible because they were "generic" rather than based upon any specific indication of tailoring, concluding that "this Court has approved of such 'generic' comment before." *Id.* at 71, 120 S.Ct. 1119 (citing *Reagan v. United States,* 157 U.S. 301, 15 S.Ct. 610, 39 L.Ed. 709 (1895)). Consequently, the majority declined to extend the reasoning in *Griffin* to the defendant's case and ultimately held that:

In sum, we see no reason to depart from the practice of treating testifying defendants the same as other witnesses. A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening. Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and[,] indeed, given the inability to sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth. [7]

*Id.* at 73, 120 S.Ct. 1119. Accordingly, the majority reversed the judgment of the Second Circuit. *Id.* at 75, 120 S.Ct. 1119. In a concurring opinion, Justice Stevens, although agreeing with the majority that the prosecutor's comments "survived constitutional scrutiny," "register[ed] his disagreement with the [majority's] implicit endorsement" of the prosecutor's closing argument. *Id.* at 76, 120 S.Ct. 1119 (Stevens, J., concurring, joined by Breyer, J.). Inasmuch as the concurrence fundamentally disapproved of the prosecutor's comments, it stressed that the majority's final conclusion did not "deprive [s]tates or trial judges of the power either to prevent such argument entirely or to provide juries with instructions that explain the necessity, and the justifications, for the defendant's attendance at trial." *Id.*

The dissent in *Portuondo* disapproved of the majority's holding, asserting that "[t]he [majority] today transforms a defendant's presence at trial from a Sixth Amendment right into an automatic burden on his credibility." *Id.* at 76, 120 S.Ct. 1119 (Ginsburg, J., dissenting, with whom Souter, J., joined). The dissent characterized the majority's attempt to distinguish *Griffin* as "unconvincing," *id.* at 84, 120 S.Ct. 1119, and instead opined that both *Griffin* and *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (holding that a defendant's silence after receiving *Miranda* warnings did not warrant a prosecutor's attack on his credibility) were analogous to the case before it. *Id.* at 77, 120 S.Ct. 1119. More specifically, the dissent stated that *Griffin* and *Doyle* "stem from the principle that where the exercise of a constitutional right is 'insolubly ambiguous' as between innocence and guilt, a prosecutor may not unfairly encumber those rights by urging the jury to construe the ambiguity against the defendant" and argued, contrary to the majority's view, that "the same principle should decide [the defendant's] case." *Id.* (internal citation omitted).

---

7. The Court also addressed the issue whether the prosecutor's comments violated the defendant's Fourteenth Amendment right to due process. *Portuondo,* 529 U.S. at 74, 120 S.Ct. 1119. However, such issue was based on a state statute that the defendant argued required him to be present at trial. *Id.* at 74–75, 120 S.Ct. 1119. Although we acknowledge that Mattson asserted during oral argument that he was required to be present at trial, there is no *statute* in this jurisdiction that compels the attendance of criminal defendants at trial. Consequently, we do not further discuss the majority's reasoning regarding the Fourteenth Amendment right to due process.

Examining the facts in *Portuondo*, the dissent reasoned:

> [The defendant] attended his trial, as was his constitutional right and his statutory duty, and he testified in a manner consistent with other evidence in the case. One evident explanation for the coherence of his testimony cannot be ruled out: [the defendant] may have been telling the truth. It is no more possible to know whether [the defendant] used his presence at trial to figure out how to tell potent lies from the witness stand than it is to know whether an accused who remains silent had no exculpatory story to tell.

*Id.* The dissent further reasoned that "every defendant who testifies is equally susceptible to a generic accusation about his opportunity for tailoring" and "the prosecutorial comment at issue, tied only to the defendant's presence in the courtroom and not to his actual testimony, tarnishes the innocent no less than the guilty." *Id.* at 77–78, 120 S.Ct. 1119. As a result, the dissent concluded that

> the interests of truth are not advanced by allowing a prosecutor, at a time when the defendant cannot respond, to invite the jury to convict on the basis of conduct as consistent with innocence as with guilt. Where burdening a constitutional right will not yield a compensating benefit, as in the present case, there is no justification for imposing the burden.

*Id.* at 79, 120 S.Ct. 1119. In other words, the dissent espoused the belief that a generic accusation of tailoring based solely on a defendant's presence at trial would burden the constitutional right of a defendant to be present throughout his or her trial.

The dissent further disapproved of the majority's holding that to prohibit generic accusations of tailoring at summation would "prohibit[ ] prosecutors from inviting the jury to do what the jury is perfectly entitled to do." *Id.* at 86, 120 S.Ct. 1119 (citation and internal quotation marks omitted). More specifically, the dissent pointed out that the majority "offer[ed] no prior authority ... for the proposition that a jury may constitutionally draw the inference now at issue," *i.e.*, infer that a defendant who is present at trial tailored his testimony to match the evidence presented, and argued that, "even if juries were permitted to draw the inference in question, *it would not follow that prosecutors could urge juries to draw it.*" *Id.* (emphasis added).

Ultimately, the dissent concluded that the majority's holding produced a "prosecutorial practice that burdens the constitutional rights of defendants, that cannot be justified by reference to the trial's aim of sorting guilty defendants from innocent ones, and that is not supported by our case law." *Id.* at 88, 120 S.Ct. 1119. Consequently, the dissent endorsed the reasoning of the Second Circuit and concluded that:

> The restriction that the [Second Circuit] placed on generic accusations of tailoring is both moderate and warranted. That court declared it *permissible for the prosecutor to comment on what the defendant testified to regarding pertinent events*—the fit between the testimony of the defendant and other witnesses. What is *impermissible*, the Second Circuit held, is simply and only a summation bolstering the prosecution witnesses' credibility vis-a-vis the defendant's *based solely on the defendant's exercise of a constitutional right to be present during the trial.*

*Id.* (emphases added) (citation, internal quotations marks, and ellipsis omitted).

On application, Mattson argues that, "[i]n rendering its decision, the ICA failed to address the *Portuondo* dissent's persuasive arguments and this [c]ourt's long-standing principle that the Hawai'i Constitution may afford the people of the State of Hawai'i more protection than by the federal constitution." More specifically, Mattson points to the rationale from the *Portuondo* dissent that the majority's holding "transform[s] a defendant's presence at trial from a Sixth Amendment right into an automatic burden on his credibility" (citing *Portuondo*, 529 U.S. at 76, 120 S.Ct. 1119 (Ginsburg, J., dissenting, with whom Souter, J., joined)) and argues that the *Portuondo* dissent more adequately protects the constitutional rights of defendants. Accordingly, Mattson argues that this court "should reject the *Portuondo* majority, as its reasoning does not adequately preserve the right to confrontation guar-

anteed under article I, section 14 of the Hawai'i Constitution, or the right to testify under various state constitutional guarantees." Consequently, Mattson urges this court to adopt the reasoning set forth in the *Portuondo* dissent and hold that "a prosecutor's generic accusation during summation that a defendant tailored testimony to evidence presented [i]s improper and unconstitutional."

In its answering brief, the prosecution essentially contended that the *Portuondo* majority is well-reasoned and should be followed and that, under *Portuondo*, it is clear that the prosecutor's remarks during closing argument did not violate Mattson's constitutional rights. Although acknowledging that this court has often given broader protection under the Hawai'i Constitution than that given by the federal constitution, the prosecution argued that Mattson "has not shown in this case that additional protection is warranted."

■■■ As acknowledged by the parties, we have consistently stated that, "as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution," this court is free to "give broader protection under the Hawai'i Constitution than that given by the federal constitution." *State v. Arceo*, 84 Hawai'i 1, 28, 928 P.2d 843, 870 (1996) (quoting *State v. Wallace*, 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710 n. 14 (1996)) (internal quotation marks omitted). We have also previously concluded that, "when the United States Supreme Court's interpretation of a provision present in both the United States and Hawai'i Constitutions does not adequately preserve the rights and interests sought to be protected, we will not hesitate to recognize the appropriate protections as a matter of state constitutional law." *State v. Bowe*, 77 Hawai'i 51, 57, 881 P.2d 538, 544 (1994) (citations, internal quotation marks, and original brackets omitted).

■■■ Upon careful consideration of the reasoning set forth in *Portuondo* and the arguments of the parties, we believe that the holding of the *Portuondo* majority does not provide adequate protection of defendant's rights under article I, section 14 of the Ha-

wai'i Constitution, *i.e.*, the confrontation clause. It is well-settled that upholding a defendant's rights under the confrontation clause is essential to providing a defendant with a fair trial. *See State v. Peseti*, 101 Hawai'i 172, 180, 65 P.3d 119, 127 (2003) (stating that the confrontation clause "provides two types of protections for a criminal defendant: the right physically to face those who testify against him [or her], and the right to conduct cross-examination" (brackets in original)); *see also Apilando*, 79 Hawai'i at 131, 900 P.2d at 138 (stating that "[t]he confrontation right provides the criminal defendant with the opportunity to defend himself [or herself] through our adversary system by prohibiting ex parte trials, granting the defendant an opportunity to test the evidence in front of the jury, and guaranteeing the right to face-to-face confrontation" (quoting O. Weinstein, *Coy v. Iowa: Reconciling a Defendant's Right to Confrontation with a Child–Witness' Interest in Avoiding Undue Psychological Trauma*, 23 Loy. L.A. L.Rev. 415, 437 (1989) (brackets in original))). Further, although this court has previously allowed the prosecution wide latitude when making closing remarks, we have also concluded that a prosecutor's comments may *not* infringe on a defendant's constitutional rights. For example, in *State v. Wakisaka*, 102 Hawai'i 504, 78 P.3d 317 (2003), this court held that it is "a bedrock principle of the Hawai'i Constitution" that "the prosecution cannot comment on the defendant's failure to testify because this infringes on the defendant's right not to be a witness against her—or himself." *Id.* at 515, 78 P.3d at 328.

As aptly observed by the *Portuondo* dissent, the holding of the *Portuondo* majority "transforms a defendant's presence at trial from a [constitutional] right into an automatic burden on his credibility." *Portuondo*, 529 U.S. at 76, 120 S.Ct. 1119 (Ginsburg, J., dissenting, with whom Souter, J., joined). Indeed, under the reasoning of the majority, the prosecution can permissibly make a comment that is related *only* to the defendant's presence in the courtroom and not to his actual testimony. *Id.* at 73, 120 S.Ct. 1119. As a result, every defendant who testifies is "equally susceptible" to such a generic accu-

**326**

sation that he or she has tailored his or her testimony, *regardless of the content of the testimony.* *Id.* at 77, 120 S.Ct. 1119 (Ginsburg, J., dissenting, with whom Souter, J., joined). Thus, we believe—as also observed by the *Portuondo* dissent—that applying the majority's reasoning would produce a "prosecutorial practice that burdens the constitutional rights of defendants, that cannot be justified by reference to the trial's aim of sorting guilty defendants from innocent ones[.]" *Id.* at 88, 120 S.Ct. 1119.

■ We are instead persuaded by the reasoning of the *Portuondo* dissent. More specifically, we agree that a restriction placed on the prosecutor's ability to make generic accusations of tailoring during closing argument is "both moderate and warranted," *id.* at 88, 120 S.Ct. 1119, because such accusations "cannot sort those who tailor their testimony from those who do not, much less the guilty from the innocent." *Id.* at 78, 120 S.Ct. 1119. We also agree that "allowing a prosecutor, at a time when the defendant cannot respond, to invite the jury to convict on the basis of conduct as consistent with innocence as with guilt," *id.* at 79, 120 S.Ct. 1119, would not only be improper, but would also disregard the truth-seeking purpose of a trial inasmuch as generic accusations of tailoring do *not* aid the jury in any way in determining whether a defendant has tailored his testimony or simply related a true version of the events. Consequently, we agree with the *Portuondo* dissent, as indicated above, that generic accusations of tailoring during closing argument that are based only on a defendant's presence throughout the trial burden the defendant's constitutional right to be present at trial and could discourage a defendant from exercising his constitutional right to testify on his own behalf. Accordingly, we adopt the reasoning of the *Portuondo* dissent and conclude that it would be improper, under article I, section 14 of the Hawai'i Constitution, for the prosecution to make generic accusations during closing argument that a defendant tailored his testimony based solely on the defendant's exercise of his constitutional right to be present during the trial. We now turn to examine whether the prosecutor's remarks in the instant case were constitutionally improper.

■ Mattson contends on application that the prosecutor in the present case made the very kind of "generic accusation during summation" that the Hawai'i Constitution prohibits. More specifically, Mattson argues:

The prosecutor did not indicate that Mattson's opportunity to tailor his statements was in any way evidenced by Mattson's testimony or connected to its cross-examination of Mattson. The prosecutor did not connect any accusation to specific evidence of tailoring at trial, but instead, made a general accusation resting not on evidentiary support, but only innuendo. This kind of argument invited the jury to infer that any consistency in Mattson's testimony with the testimony of other witnesses derived from Mattson's presence at trial, rather than allowing the jury to weigh the evidence and credibility of the testimony on the merits. Consequently, the prosecutor's comments violated Mattson's right to be present at trial for the purpose of confronting witnesses and to testify in his defense.

In its answering brief, the prosecution argued that, even assuming this court adopts the rationale of the *Portuondo* dissent, the prosecutor's comments did not violate Mattson's constitutional rights because "the prosecutor's remark[s], based entirely upon the evidence, reflected [her] legitimate attempt to draw attention to the incredibility of [Mattson's] version of the incident against the testimony of all of the other witnesses." The prosecution further argued that such comments were clearly "narrowly tailored to the specific evidence adduced at trial, including the 911 call[ ], the other witnesses' statements[,] and even [Mattson's] own conflicting statements."

As previously indicated, the prosecutor, during closing argument, stated:

He told you he lied before. He had a chance to sit through the evidence. He had to make his story gibe with what you've heard. What is in evidence. What [Kumia] even had to admit to, because she—.... He sat through the evidence. There is a 911 tape. [Kumia's] statement. [Hayashi's] statement. Based on all that,

*he is not telling the truth.* All of a sudden he remembered that he grabbed that knife.

This case is about credibility. In order to believe the defendant, you have to be able to answer why didn't [Kumia] just give him the key? Why did [Kumia] lock him out of the house that night? Why lie the day after the event? Thank you.

(Emphases added.) We first acknowledge that the prosecutor, in making the above-quoted argument: (1) clearly drew attention to Mattson's presence throughout the trial when she argued that "[h]e had a chance to sit through the evidence" and later repeated that "he sat through the evidence"; and (2) specifically made an accusation that Mattson tailored his testimony to the evidence presented when she argued that "[h]e had to make his story gibe [sic] with what you've heard." However, the prosecutor also referred to specific evidence adduced at trial that was directly contradictory to Mattson's testimony.

Specifically, the prosecutor referenced the 911 tape that was played for the jury, Kumia's statement, and Hayashi's statement. As previously indicated, the 911 tape included evidence that Mattson was threatening Hayashi with a knife on October 13, 2007. *See supra* note 4. Additionally, Kumia's and Hayashi's statements established that, on the night in question, Mattson grabbed a knife, swung it at Hayashi, and threatened him with it. The aforementioned evidence directly contradicted Mattson's own testimony that the knife was closed and that he did not threaten Hayashi with it.

The prosecutor also relied on the fact that Mattson's testimony at trial conflicted with the interview he gave Detective Smith on October 14, 2007. More specifically, the prosecutor referenced the fact that Mattson told the jury that he "lied before." Such an argument logically refers to Mattson's admission at trial that he "made up" parts of the interview with Detective Smith because he "only wanted to make the statement that help[ed him]." Additionally, the prosecution specifically highlighted the fact that Mattson "[a]ll of a sudden ... remembered that he grabbed that knife." It is reasonable to infer that the prosecutor was referring to the in-

consistency between Mattson's interview with Detective Smith, at which time he stated that he never had a knife inside the apartment, and his version of the events after he heard the evidence presented at trial, *i.e.*, his testimony that he grabbed a knife on a table in his apartment but did not open it.

Based on the foregoing, it is evident that, in addition to citing the fact that Mattson was present at trial and heard testimony of other witnesses, the prosecutor identified and relied upon specific evidence adduced at trial that demonstrated the inconsistencies between Mattson's testimony at trial and Kumia's 911 call, Kumia's statement, Hayashi's statement, and Mattson's own prior statements. Because the prosecution referred to specific evidence presented at trial *in addition* to referring to Mattson's presence at trial, it cannot be said that the prosecutor's remarks during closing argument constituted a "generic accusation" that Mattson tailored his testimony based *solely* on his presence at trial. Consequently, given these circumstances, we conclude that the prosecutor's comments did not violate Mattson's constitutional right to be present at trial under article I, section 14 of the Hawaiʻi Constitution. It, therefore, follows that the prosecutor's comments did not constitute prosecutorial misconduct.

Inasmuch the prosecutor's comments did not violate Mattson's constitutional rights, it was not necessary for the trial court to *sua sponte* instruct the jury regarding Mattson's constitutional right to be present at trial. Accordingly, there is no need to address Mattson's remaining argument that the trial court committed plain error in failing to instruct the jury that Mattson "had a constitutional right to be present throughout the trial and the jury must not draw any unfavorable inference regarding Mattson's credibility simply on the basis of his presence at trial."

## IV. CONCLUSION

Based on the foregoing, we adopt the reasoning of the dissent in *Portuondo v. Agard*, 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000) (Ginsburg, J., dissenting, with whom Souter, J., joined) and conclude that it would

be improper, under article I, section 14 of the Hawai'i Constitution for the prosecution to make generic accusations during closing argument that a defendant has tailored his or her testimony based solely on the defendant's exercise of his or her constitutional right to be present at trial. In the instant case, however, we conclude that the prosecutor's comments were based on specific evidence adduced at trial—not solely on Mattson's exercise of his right to be present at trial—and, thus, such comments were not improper under the Hawai'i Constitution. Consequently, we affirm the ICA's June 12, 2009 judgment on appeal that, in turn, affirmed the trial court's April 22, 2008 judgment of conviction and sentence.

## DISSENTING OPINION BY ACOBA, J., IN WHICH DUFFY, J., JOINS.

I respectfully dissent.

1. Article I, section 14 of the Hawai'i Constitution states in relevant part:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the district wherein the crime shall have been committed, which district shall have been previously ascertained by law, or of such other district to which the prosecution may be removed with the consent of the accused; to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against the accused*[.]
> (Emphasis added.)

2. It should be noted that in *State v. Sisneros*, 100 Hawai'i 296, 59 P.3d 931, 2002 WL 31888186 (Haw. Dec.24, 2002) (SDO), this court addressed the same issue presented in the instant case, but declined to publish its holding. In *Sisneros*, the defendant argued "that the trial court erred in denying his motion for mistrial premised upon the prosecutor's comments that Sisneros tailored his testimony to that of the other witnesses." *Id.* at *1. The majority "assum[ed] arguendo" that the tailoring argument amounted to constitutional violations, but concluded that the presentation of the tailoring argument was harmless error inasmuch as "(1) there was overwhelming evidence of Sisneros's guilt; and (2) any adverse effect on Sisneros's credibility resulting from the prosecutor's argument was minimal as compared to the numerous instances where Sisneros's credibility was legitimately called into question." *Id.*

The dissent in *Sisneros* disagreed, concluding that the accusation of tailoring was not harmless. *Id.* at *20 (Acoba, J., dissenting, joined by Ramil, J.). In addressing the rule set forth by the majority in *Portuondo v. Agard*, 529 U.S. 61, 120

The majority's decision in this case unduly burdens a defendant's right to confront witnesses under article I, section 14 of the Hawai'i Constitution,[1] thereby undermining a fundamental principle of our justice system.[2] Although the majority purports to adopt the position of the dissent in *Portuondo*, 529 U.S. at 76, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.), this approach, as shown by several state decisions, provides little protection to defendants who not only have the constitutional right to be present at trial, but, as in our jurisdiction, are required by law to do so. The better rule, which is set forth in *State v. Daniels*, 182 N.J. 80, 861 A.2d 808 (2004), discussed *infra*, would prohibit the prosecution from explicitly referring "to the fact that the defendant was in the courtroom or that he heard the testimony of other witnesses, and was thus able to tailor his testimony." *Id.* at 819.

S.Ct. 1119, 146 L.Ed.2d 47 (2000), the dissent stated:

> [S]imply because a jury has a "natural or irresistible" inclination to draw the inference that a defendant who testifies has tailored his or her own testimony, "it would not follow that prosecutors could urge juries to draw it[,]" *id.* at 86, 120 S.Ct. 1119 [(Ginsburg, J., dissenting, joined by Souter, J.)], or that the jury should go uninstructed as to such matters. As Justice Ginsburg points out, although arguably a jury may be inclined to infer something about a defendant, such as a defendant's choice to remain silent after receiving Miranda warnings, and a defendant's failure to testify, a jury instruction will direct them not to draw it.

*Sisneros*, 2002 WL 31888186, at *21 (Acoba, J., dissenting, joined by Ramil, J.) (citing *Portuondo*, 529 U.S. at 85–87, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.)). The dissent also noted that it would have been better to publish this court's decision in *Sisneros* because it addressed two issues of first impression, i.e., whether tailoring arguments were constitutional and whether a court restricting access to counsel during a court recess violated the defendant's right of representation by counsel. *Id.* at *2. In *Sisneros*, the prosecutor made a "generic" tailoring comment, drawing the jury's attention to the defendant's presence throughout the trial without pointing to any specific inconsistencies indicating that the defendant had actually tailored his testimony to match that of other witnesses. *Id.* at *22 In the instant case, the prosecutor did allude to specific inconsistencies between the testimony of Petitioner/Defendant–Appellant Joseph Mattson, III (Petitioner) and prior statements that Petitioner had made to the police.

Accordingly, I would hold that all accusations of tailoring at any stage of the trial, including cross examination and summation, impermissibly burden a defendant's right to be present at trial and confront witnesses against him. Such a rule leaves ample opportunity for the prosecution to impeach the credibility of a defendant based on specific instances of inconsistent testimony and allows the trier of fact to draw its own reasonable inferences based on the evidence, rather than to rely, even in part, on accusations that the defendant was able to shape his testimony simply because he was present, as he had a right to be, at his own trial. Although the constitutional right to confront witnesses should be sufficient to justify a rule barring accusations of tailoring, the additional fact that Hawaiʻi Rules of Penal Procedure (HRPP) Rule 43 (2008) mandates defendants, such as Petitioner, to be present at all stages of the trial further compels prohibiting such accusations. Also, the same rationale which would prohibit the use of tailoring arguments at trial requires that courts "provide juries with instructions that explain the necessity, and the justifications, for the defendant's attendance at trial." *Portuondo*, 529 U.S. at 76, 120 S.Ct. 1119 (Stevens, J., concurring, joined by Breyer, J.).

## I.

The following essential matters, some verbatim, are from the record and the submissions of the parties.

### A.

In relevant part, on October 24, 2007, Petitioner was charged by complaint as follows:

[*COUNT I:* ] On or about the 13th day of October, 2007, in the City and County of Honolulu, State of Hawaii, *[Petitioner] threatened, by word or conduct to cause bodily injury to Joey Hayashi [ (Joey) ], with the use of a dangerous instrument,* in reckless disregard of the risk of terrorizing said [Joey], thereby committing the of-

fense of Terroristic Threatening in the First Degree in violation of Section 707–716(1)(e) of the Hawaii Revised Statutes [ (HRS) ]. [3]

(Emphasis added.)

A jury trial was conducted from January 9, 2007 through January 11, 2007. At trial, Joey, Petitioner's son, Valerie Kumia (Val), Petitioner's roommate, Officer Ashlene Gormley (Gormley), Officer Theodore Merrill (Merrill) and Officer Thomas Smith (Smith) testified for Respondent/Plaintiff–Appellee State of Hawaiʻi (Respondent), and Petitioner testified on his own behalf. The testimony of the three percipient witnesses at trial was conflicting as to the events of October 13, 2007.

### B.

The following testimony was given by Joey at trial. In October 2007, Joey was staying temporarily with Petitioner and Val in Wahiawa, while Joey completed a two-week construction job in Haleiwa.

In the afternoon on Saturday, October 13, 2007, Joey returned to Petitioner's home from work, and consumed vodka and soda cocktails. At around 9:00 or 9:30 p.m., Joey and Petitioner were watching television while Joey waited for his friend, Josh, to pick him up. Joey had borrowed Petitioner's cellular telephone at the time. Petitioner's phone rang and Josh's number was displayed, but when Petitioner answered, it was Joey's girlfriend. The caller hung up on Petitioner, which upset Petitioner, who began cursing and making threatening and disparaging comments regarding Josh. Petitioner believed that the caller had been Josh, who was with a female.

Joey thought it was likely his girlfriend calling and that Josh's number had only appeared because they called at the same time. Joey told Petitioner that Josh was not with a female. Joey grabbed the phone in order to call Josh, but Petitioner took the phone from

---

**3.** Petitioner was also charged in Count II as follows but was acquitted of that charge:

*COUNT II:* On or about the 13th day of October, 2007, in the City and County of Honolulu, State of Hawaii, [Petitioner] did intentionally,

knowingly, or recklessly physically abuse [Joey], a family or household member, thereby committing the offense of Abuse of Family or Household Members, in violation of Sections 709–906(1) and (5) of the [HRS].

Joey. Joey attempted to get the phone back, and loudly and angrily shouted at Petitioner to give him the phone, while cursing and saying hurtful things.

Joey placed Petitioner in a headlock, causing him to choke. Joey was standing and Petitioner was on his knees. Petitioner did not attempt to strike Joey, but instead yelled for Val, who was in her bedroom. Val entered the living room and told Joey to release Petitioner. Joey complied.

Petitioner then grabbed a knife from a table, opened it, and began swinging the knife at Joey. Joey backed up against a wall, and Petitioner missed Joey and stabbed some cardboard behind Joey. Joey then tripped over something on the floor and fell.

Petitioner began to choke Joey, and tried to stab his leg. Joey asked Petitioner to drop the knife and fight "like a man," but Petitioner said, "You tried to kill me, and I'm going to kill you now." Joey grabbed Petitioner's right hand, in which the knife was held, and Petitioner punched Joey in the face several times with his left hand.

Petitioner's phone rang, and he ceased fighting to answer it. It was Joey's girlfriend calling, and Petitioner threw the phone at Joey. When Joey hung up the phone, Petitioner told Joey he was going to harm Josh. A car's headlights appeared through the window, and Petitioner went toward the front door, believing Josh had arrived. Joey attempted to stop Petitioner, but retreated because Petitioner still had the knife.

Joey looked out the window and saw it was not Josh's car and therefore, closed and locked the front door with Petitioner outside. Joey told Val to lock the back door and to call the police. Joey called Josh to tell him not to come. Joey then went into Val's room, where Petitioner was reaching through a window. Petitioner had cut the window screen and was attempting to pull out the louvers. Petitioner swung the knife at Val while she attempted to close the window.

Joey went to the living room to get an unloaded gun and a hatchet. Joey told Petitioner he was loading the gun, but never actually loaded it because he only wanted to

scare Petitioner. Joey aimed the gun at Petitioner and told him to leave. Petitioner laughed and said Joey was going to be arrested. Joey set the gun down, and helped Val attempt to close the window, but Petitioner continued to swing the knife through the window, and therefore Joey hit Petitioner's hand with the back of the hatchet. After being struck by the hatchet, Petitioner pounded on the window, demanding entry. The police then arrived and placed Petitioner under arrest.

Joey was subsequently interviewed by a police detective over the telephone. Joey told the detective about the argument between Petitioner and himself, the knife, Petitioner's threats, and the various phone calls, but did not inform the detective about the gun, fearing he would be arrested for having brandished it. Joey spoke with the detective again a few hours later, and when specifically asked if there was a gun involved, admitted that he had used a gun. Joey had also stated initially that Petitioner had not requested him to leave prior to grabbing the knife, but later admitted that Petitioner had asked him to leave before threatening him with the knife, and that Joey had refused.

### C.

The following testimony was given by Val at trial. Val testified that she resided in a one-bedroom apartment with Petitioner, and that in October 2007, Joey stayed with them for about two weeks. On October 13, 2007, Val observed that Joey was intoxicated— slurring his words, and unsteady on his feet, as he had made himself a strong alcoholic beverage upon returning from work at about 3:15 p.m.

Around 9:30 p.m., Val smoked a cigarette on the back porch, while Petitioner and Joey watched television in the living room. Val heard Petitioner call for her, but ignored it at first. Upon hearing him call a second time, she rushed to the living room, because he sounded desperate. Val saw Joey choking Petitioner, who was on his knees. Concerned that Petitioner would lose consciousness due to a medical condition, she ordered Joey to let him go. Joey eventually com-

plied, following which, Petitioner rose and grabbed a pocket knife from the table.

Petitioner approached Joey with the knife, and Joey backed up and fell over some boxes on the floor. According to Val, Petitioner did not swing his knife at Joey, although she conceded that she had stated to the contrary in her prior written statement to the police, and had also stated that Petitioner shoved Joey into the corner of the room. Joey attempted to get up and shouted, "Dad, don't cut me."

Val went to her room to call 911, and from her bedroom, she could hear Petitioner and Joey yelling at each other. After finishing her 911 call, Val heard the front door slam, and returned to the living room. Petitioner was yelling outside, asking for his keys and cell phone.

Joey told Val to lock the back door, and both of them proceeded to the bedroom to lock the door. Petitioner tried to enter through a back window. Val heard Joey yelling from the living room, "Dad, I'm getting my gun. I'm going to shoot you." Val, surprised that Joey had a gun, went to the living room, where she observed Joey loading her gun. Val then heard the screen on the back window being torn, and returned to the bedroom to secure the louvers.

According to Val, because she and Joey were initially interviewed together by the police, she only included in her written statement those facts that had been mentioned by Joey, and, thus, her statement was based on Joey's statement.

### D.

Officers Gormley, Merrill, and Smith testified at the trial. On October 13, 2007, at about 9:30 p.m., officers Gormley and Merrill were dispatched to Petitioner's home, after being advised that there was an argument involving a knife. Upon arriving at Petitioner's home, Gormley saw Joey come out the front door, shouting, "He's got a knife." Merrill heard Joey say, "He tried to stab me." Petitioner then came out from the behind the building, and Gormley told him to stop. Merrill pointed his pistol at Petitioner,

and commanded him to lie down, which Petitioner did.

Joey was shaking and upset. After calming him down, Gormley took a statement from Joey, and then interviewed Val. Both Joey and Val provided written statements. Petitioner was arrested and then taken to the hospital, because he had cuts on his hands and complained of pain.

Merrill discovered a knife at the scene, hidden underneath the corner of a washing machine on the lanai behind Petitioner's apartment.

Smith interviewed Petitioner on October 14, 2007. Subsequently, Smith contacted Joey because he had never mentioned that a gun was involved. Joey then admitted that there had been a gun.

### E.

Petitioner was the last to testify. According to Petitioner, on October 13, 2007, he had gone to work at around 6:00 a.m., and had offered Joey a ride to Kapolei, but he declined. Joey, who normally resides in Waianae, had been staying with Petitioner for about two weeks. Joey was supposed to have left Petitioner's home the previous evening, October 12, 2007, but had not.

On the evening of October 13, 2007, Petitioner arrived home at around 5:00 p.m. Joey, who was intoxicated, fell asleep around 7:00 p.m. Petitioner's cell phone rang, and he answered it. It was for Joey, so Petitioner wakened Joey and told him a female was on the phone for him.

Petitioner related that Joey swore and yelled at the caller and, upon hanging up, threw the phone down between him and Petitioner. Petitioner told Joey not to be disrespectful with his phone, and that he did not approve of Joey's tone while on the phone. Joey cursed at Petitioner, and Petitioner warned him that if he was unhappy with the circumstances, he should not use the phone and should leave Petitioner's home.

Petitioner's phone rang again, and Joey tried to take it from Petitioner, but Petitioner told Joey it was his phone and he would answer it. Petitioner answered, the same

female asked to speak to Joey, and Petitioner handed the phone to Joey. Again, Joey yelled and cursed during the conversation, and upon finishing the call, threw the cell phone down. Petitioner told Joey to "watch his language" and respect his property, and again that he should leave if he continued to act disrespectfully.

Joey asked to call Josh, who was supposed to be picking him up. Petitioner allowed Joey to use the phone, and heard Joey asking "where are you" and "why are you not here yet." Upon finishing the call, Joey gave the phone to Petitioner.

The phone rang again, and both Petitioner and Joey reached for it. Again, Petitioner reminded Joey that it was his phone and he would answer it. Petitioner answered, and again it was a female. Joey reached for the phone, believing it was his friend calling, and Petitioner informed him that it was a female. Petitioner heard the female laughing before she hung up.

Joey became upset, and "yanked" the phone from Petitioner. Joey then called Josh and asked whether a girl was with him, and Josh said no. Joey then accused Petitioner of lying and began saying derogatory things to him. Petitioner became upset and told Joey to leave. Joey refused, and challenged Petitioner to a fight. Again, Petitioner asked Joey to leave. Joey did not leave, and proceeded to put Petitioner in a headlock. Petitioner began choking and called to Val for help. Petitioner continued to yell until he could not make a sound, and then lost consciousness.

When Petitioner revived, Joey was standing over him, still upset. Petitioner grabbed his knife from the table, and, while holding the knife closed, told Petitioner to leave. Joey remained and stated, "You fucking pussy, you need one knife now?" Petitioner moved toward Joey believing that Joey had made advances toward him, and Joey moved backward and fell over something on the floor. There was a box of glasses near Joey, and Petitioner, feeling concerned that Joey might be cut, walked over to Joey to help him up, but Joey began kicking and punching. According to Petitioner, he never opened the knife.

Petitioner then noticed a light outside, and opened the door to speak with the building's owner and another tenant. Petitioner returned inside and told Joey to be quiet, but Joey kept shouting. Petitioner then saw headlights appear outside, and believed Josh had arrived. Petitioner went outside to let Josh know that Joey was intoxicated and should be taken straight home, but, upon approaching the car, realized it was not Josh.

Petitioner returned, but the door had been locked, presumably by Joey. Petitioner, having decided to leave, knocked and requested his keys and company phone. No one responded, so Petitioner went to the back door, but it was also locked. He went to an open window and attempted to remove the screen, and because he was unable to remove it, Petitioner took out his knife and cut the screen, and also attempted to remove the louvers.

Val came to the window, and Petitioner asked her for his phone and keys, but she asked him to leave. Petitioner then closed his knife, placed it on a table on the back porch, and reached through the window in order to prevent Val from closing it. Val attempted to close the window and then Joey appeared, threatening Petitioner that he would chop off his fingers if he refused to leave. Petitioner felt something strike his hand, and pulled it back slightly, while keeping it inside the window to ensure the window would remain open until he obtained his keys and phone.

Petitioner then saw that Joey had a gun. Joey pulled the hammer back and said he would shoot. Petitioner decided to leave and walk to his uncle's house nearby. When Petitioner walked to the front of the building, he was arrested by the police, and taken to the hospital for treatment of his injuries.

### F.

At trial during cross-examination of Petitioner, the prosecution questioned Petitioner as to his presence during the presentation of evidence by Respondent.

[PROSECUTOR]: Your memory of what happened, would you agree with me,

was better the day after it happened than it is today?

[PETITIONER]: Yes and no.

Q. How is it not better?

A. I didn't get no sleep.

Q. Okay. *Or is it that you had opportunity to see what [Respondent] does have in evidence?*

A. *No.*

Q. So you haven't had an opportunity to see what [Respondent] has in evidence?

A. Only unit the [c]ourt. [sic]

Q. Okay. *And you have had the opportunity to sit through the evidence that's been presented?*

[DEFENSE COUNSEL]: *Objection, Your Honor. That's going into [State v. Maluia, 107 Hawai'i 20, 108 P.3d 974 (2005)].*

THE COURT: *Overruled.*

Q. *You had the opportunity to sit through the evidence that's been presented?*

A. *Yes.*

Q. And you're now testifying in court, right?

A. Yes, ma'am.

Q. *After you know what [Respondent] had?*

A. Yes, ma'am.

Q. Okay. On October 15—

[DEFENSE COUNSEL]: *Your Honor, we're going to object to this line of questioning under the 4th, 5th and 16th [sic] amendment.*

THE COURT: *Overruled.*

(Emphases added.) The prosecutor went on to question Petitioner about the veracity of his statement to the police and whether inconsistencies between that statement and his testimony at trial were the result of Petitioner being present at trial.

[PROSECUTOR]: On October 15th, when you gave the statement to the police officer, you told the police officer what happened, right?

[PETITIONER]: Yes.

Q: You told them what you remember happening?

A: Yes.

Q: And you were truthful, right?

A: Yes.

Q: If you weren't, let me know. But I'm just asking, were you truthful?

A: I just don't know. Because like I said, I couldn't sleep. So I know I was answering questions.

Q: *But when you were answering questions did you make stuff up?*

A: *Some of it.*

Q: *You made up some of it?*

A: *A few things.*

Q: Like what?

A: I just didn't want to tell him—I just wanted to get my point of what happened. Not what—he was there. He was there, from what I seen, to prosecute me.

Q: Okay. What I'm asking is what part of your statement did you make up?

A: I don't know how to answer that one.

Q: Is the whole statement a lie?

A: No

Q: So parts of it are true?

A: Yes.

Q: *Only the parts that are helpful to you are true.*

A: *Well, when I made my statement, I only wanted to make the statement that helped me.*

(Emphases added.)

At the close of the trial, the prosecutor stated the following, *inter alia*, in her closing argument:

[PROSECUTOR]: Now, this is the same knife that [Petitioner] is telling you that he just placed on the back table as he was leaving.

*He told you he lied before. He had a chance to sit through the evidence. He had to make his story gibe with what you've heard.* What is in evidence. What [Val] even had to admit to, because she—

[DEFENSE COUNSEL]: *Objection, Your honor. Burden shifting.*

THE COURT: *Overruled.*

[PROSECUTOR]: *He sat through the evidence.* There is a 911 tape. [Val's] statement. Joey's statement. Based on all that, he is not telling the truth. *All of a sudden he remembered that he grabbed the knife.*

(Emphases added.) As noted, Petitioner objected to the prosecution's comments on Petitioner's presence at trial.

## G.

Following the jury trial, on January 14, 2008, Petitioner was found guilty of Count I, Terroristic Threatening in the First Degree. On April 22, 2008, Petitioner was sentenced to an indeterminate five-year prison term.

## II.

On May 20, 2008, Petitioner appealed. On appeal, Petitioner argued that

(1) the [court] *erred in allowing the prosecutor to comment during closing argument that [Petitioner's] presence during trial enabled him to tailor his testimony to match the evidence;* (2) the prosecutor's improper argument amounted to prosecutorial misconduct and deprived him of his right to due process and a fair trial, in violation of article I, sections 5 and 14 of the Hawai'i Constitution, and the fifth and fourteenth amendments to the U.S. Constitution; and (3) the [court] plainly *erred in failing to instruct the jury that [Petitioner] had a constitutional right to be present throughout trial and the jury must not draw any unfavorable inference regarding [Petitioner's] credibility simply on the basis of his presence* at trial.

*State v. Mattson,* 2009 WL 1416795, at *1 (Haw.App. May 21, 2009) (SDO) (emphases added). The ICA rejected Petitioner's arguments, holding:

(1) The United States Supreme Court's decision in *Portuondo [ ],* 529 U.S. 61[, 120 S.Ct. 1119], *forecloses [Petitioner's] claim* that the prosecutor's argument violated his rights *under the U.S. Constitution.*

(2) *The prosecutor's argument in this case was not improper under the Hawai'i Constitution. See State v. Apilando,* 79 Hawai'i 128, 142, 900 P.2d 135, 149 (1995)

(holding that "when a defendant takes the stand to testify, his or her credibility can be tested in the same manner as any other witness," and therefore, it was not improper for the prosecutor to comment that "because [the defendant] had the highest stake in the outcome of the case, he had the greatest motive to lie").

(3) *We decline to conclude that the [court] committed plain error in failing to instruct the jury, sua sponte,* that [Petitioner] had a constitutional right to be present throughout trial and the jury must not draw any unfavorable inference regarding [Petitioner's] credibility simply on the basis of his presence at trial.

*Id.* (emphases added).

Petitioner filed a petition for certiorari on September 9, 2009 (Application).

## III.

Petitioner listed the following questions in his Application:

1. Whether the ICA gravely *erred in holding that* [Respondent's] accusation during closing argument that [Petitioner's] *presence during trial enabled him to tailor his testimony to match the evidence presented was not improper under the Hawai'i Constitution.*

2. Whether the ICA gravely *erred in holding that [the court] did not commit plain error in failing to instruct the jury that [Petitioner] had a constitutional right to be present* throughout the trial and the jury must not draw any unfavorable inference regarding [Petitioner's] credibility simply on the basis of his presence at trial.

(Emphases added.)

Respondent did not file a memorandum in opposition.

## IV.

The majority asserts that Petitioner's conviction should be affirmed because the prosecutor's comments in the instant case comport with the *Portuondo* dissent rule allowing specific tailoring arguments on summation. The

majority notes that, in her closing argument, the prosecutor highlighted "specific evidence adduced at trial that was directly contradictory to [Petitioner's] testimony." Majority opinion at 327, 226 P.3d at 497. Namely, the prosecutor pointed to the inconsistencies between Val's and Joey's testimony with that of Petitioner, the 911 call made by Val, and Petitioner's testimony, as well as Petitioner's admission that he had not told the truth in his statement to the police. *Id.* at 326–27, 226 P.3d at 496–97. According to the majority, the prosecution's attack on summation was permissible under the *Portuondo* dissent rule because "the prosecution referred to specific evidence presented at trial *in addition* to referring to [Petitioner's] presence at trial[.]" *Id.* at 327, 226 P.3d at 497 (emphasis in original).

Furthermore, according to the majority, because "the prosecutor's comments did not violate [Petitioner's] rights, it was not necessary for the trial court to *sua sponte* instruct the jury regarding [Petitioner's] right to be present at trial." *Id.* at 327, 226 P.3d at 497. Thus, the majority concludes that the court did not plainly err in "failing to instruct the jury that [Petitioner] 'had a constitutional right to be present throughout the trial and that the jury must not draw any unfavorable inference regarding [Petitioner's] credibility simply on the basis of his presence at trial.'" *Id.* In my view the majority is wrong for the reasons that follow.

## V.

In *Apilando,* this court "explicitly held that the [constitutional] right of confrontation includes an accused's right to a literal face-to-face confrontation with the witnesses who testify against him or her at trial[.]" 79 Hawai'i at 136, 900 P.2d at 143. This court noted that the right to face adverse witnesses and the right to cross-examine are inherent in the confrontation clause.

The confrontation clause of the Hawai'i Constitution provides in pertinent part that "in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against the accused." Haw. Const. art. I, § 14. The confrontation clause in the sixth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, is virtually identical.

The right of confrontation affords the accused *both* the opportunity to challenge the credibility and veracity of the prosecution's witnesses and an occasion for the jury to weigh the demeanor of those witnesses. *The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him or her, and the right to conduct cross-examination. The Clause confers a right to meet face to face all those who appear and give evidence at trial.*

*Id.* at 131, 900 P.2d at 138 (brackets and ellipsis omitted) (some quotation marks and citations omitted) (first emphasis in original) (second emphasis added). This court has also held that "[a] defendant's right to testify in his or her own defense is guaranteed by the constitutions of the United States and Hawai'i." *Tachibana v. State,* 79 Hawai'i 226, 231, 900 P.2d 1293, 1298 (1995) (quoting *State v. Silva,* 78 Hawai'i 115, 122, 890 P.2d 702, 709 (App.1995)).

The right to testify in one's own behalf arises independently from three separate amendments to the United States Constitution. It is one of the rights guaranteed by the due process clause of the fourteenth amendment as essential to due process of law in a fair adversary process. The right to testify is also guaranteed to state defendants by the compulsory process clause of the sixth amendment as applied through the fourteenth amendment. Lastly, the opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony, since every criminal defendant is privileged to testify in his or her own defense, or to refuse to do so.

Because the texts of sections 5, 14, and 10 of article I of the Hawai'i Constitution parallel the fourteenth, fifth, and sixth amendments to the United States Constitution, *the right to testify is also guaranteed by these parallel provisions of the Hawai'i Constitution.*

*Id.* at 231–32, 900 P.2d 1293, 900 P.2d at 1298–99 (quoting *Silva,* 78 Hawai'i at 122–23, 890 P.2d at 709–10) (emphasis added) (brackets and ellipses omitted) (formatting altered). Additionally, HRS § 801-2 (1993) protects the right of confrontation and the right to testify:

> In the trial of any person on the charge of any offense, he *shall have a right to meet the witnesses, who are produced against him, face to face;* to produce witnesses and proofs in his own favor; and *by himself or his counsel,* to examine the witnesses produced by himself, and *cross-examine those produced against him; and to be heard in his defense.*

(Emphases added.) Thus, a defendant's constitutional right to meet accusers face-to-face, as well as to testify, are well-established under the Hawai'i Constitution and by statute.

This court has held that it is inappropriate for the prosecution to impermissibly burden the right to testify, stating that

> [i]t has long been recognized that every criminal defendant has a right to testify in his own defense. That right is basic in our system of jurisprudence and implicitly guaranteed by the Due Process Clause of the Fourteenth Amendment. While technically the defendant with prior convictions may still be free to testify, the admission of prior convictions to impeach credibility is a penalty imposed by courts for exercising a constitutional privilege. That penalty cuts down on the right to testify by making its assertion costly.

*State v. Santiago,* 53 Haw. 254, 259, 492 P.2d 657, 660–61 (1971) (internal quotation marks and citations omitted).[4] Therefore, this court "h[e]ld that to convict a criminal defendant

where prior crimes have been introduced to impeach his credibility as a witness violates the accused's constitutional right to testify in his own defense." *Id.* at 260, 492 P.2d at 661.

## VI.

In addressing the permissibility of a prosecutor's argument that a defendant was able to tailor testimony because of his presence at trial, courts have drawn distinctions between "generic" and "specific" tailoring arguments. A generic tailoring argument occurs when a prosecutor states that the defendant was able to sit through the trial and hear the testimony of other witnesses, thereby allowing the defendant the opportunity to shape his or her testimony to fit that of other witnesses, *even when there is no evidence that defendant has actually done so. See Portuondo,* 529 U.S. at 78, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.). In contrast, a specific tailoring argument is made when the prosecution alludes to facts indicating that a defendant has tailored "specific elements of his testimony to fit with particular testimony given by other witnesses[.]" *Id.* Furthermore, in assessing whether tailoring arguments are permissible, courts have considered the point in the proceedings at which such arguments are presented.

## A.

In *Portuondo,* the United States Supreme Court considered so-called "generic" comments made in summation and determined that, under the United States Constitution, a prosecutor's comment upon a defendant's presence throughout the trial does not impinge upon a defendant's right to confrontation under the sixth amendment.[5] In that

---

4. In *Santiago,* HRS § 621–22 (1968) "seemed on its face to authorize use of all prior convictions to impeach credibility[.]" 53 Haw. at 260, 492 P.2d at 661. This court required that the statute "be read in light of the basic rules of evidence[,]" and held that prior convictions "could be used [to attack credibility] only if, like perjury and offenses 'involving dishonesty or false statement,' the prior crime 'rationally carries probative value on the issue of the truth and veracity of the witness.' " *Id.* at 260, 492 P.2d at 661 (quoting in *Asato v. Furtado,* 52 Haw. 284, 293, 474 P.2d 288, 295 (1970)). It was in this context that the

court concluded the use of "prior crimes ... to impeach ... credibility ... violated the ... constitutional right to testify in [one's] own defense." *Id.* at 260, 492 P.2d 657, 492 P.2d at 661.

5. The Sixth Amendment states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature

case, during closing arguments, defense counsel asserted that both prosecution witnesses were lying, and the prosecution challenged the defendant's credibility. *See id.* at 63, 120 S.Ct. 1119. The prosecution stated, over the objection of the defense, that the defendant had the "big advantage" of sitting through the testimony of the witnesses:

> You know, ladies and gentleman, unlike all the other witnesses in this case[,] the defendant has a benefit and the benefit that he has, unlike all the other witnesses, is he gets to sit here and listen to the testimony of all the other witnesses before he testifies.
>
> . . . .
>
> That gives you a big advantage, doesn't it. You get to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence.

*Id.* at 64, 120 S.Ct. 1119 (internal quotation marks and citation omitted). The defendant in *Portuondo* argued that those comments unfairly burdened his right to be present at trial. The New York Supreme Court upheld the conviction and the New York Court of Appeals denied the defendant's further appeal. *Id.* The defendant subsequently filed a habeas corpus petition in federal court. The district court denied the defendant's petition, but the Second Circuit Court of Appeals reversed, holding that the prosecutor's statements on summation that the defendant tailored his testimony to match that of other witnesses was impermissible because it infringed on the defendant's constitutional right of confrontation. *Id.*

On certiorari, a majority of the Court reversed, holding that all testifying witnesses should be treated the same, and, thus, such comments did not violate the defendant's constitutional rights. *See id.* at 65, 73, 120 S.Ct. 1119. The *Portuondo* majority explained that, because the jury will likely conclude on its own that a defendant who testifies last will tailor his or her testimony, a prosecutor's comments to that effect are not improper.

> [I]t is natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to have in mind and weigh in the balance the fact that he [or she] heard the testimony of all those who preceded him [or her]. ... [I]t is something else (and quite impossible) for the jury to evaluate the credibility of the defendant's testimony while blotting out from its mind the fact that before giving the testimony the defendant had been sitting there listening to the other witnesses.

*Id.* at 67–68, 120 S.Ct. 1119 (emphasis added). According to the *Portuondo* majority, prohibiting the prosecution from arguing to the jury that a defendant's position allows him to tailor his testimony "either prohibits inviting the jury to do what the jury is perfectly entitled to do; or it requires the jury to do what is practically impossible." *Id.* at 68, 120 S.Ct. 1119.

Despite joining the majority's result, Justice Stevens's concurrence strongly condemned the prosecution's argument in *Portuondo* because it degraded the criminal law system and encouraged disrespect of a defendant's constitutional rights.

> The defendant's Sixth Amendment right "to be confronted with the witnesses against him" serves the truth-seeking function of the adversary process. Moreover, it also reflects respect for the defendant's individual dignity and reinforces the presumption of innocence that survives until a guilty verdict is returned. *The prosecutor's argument in this case demeaned that process, violated that respect, and ignored that presumption.* Clearly such comment should be discouraged rather than validated.

*Id.* at 76, 120 S.Ct. 1119 (Stevens, J., concurring, joined by Breyer, J.) (emphasis added). Arguably, acts "demeaning" to constitutional principles should result in vacation of a conviction. However, it is worth noting Justice Steven's statement that the Supreme Court's decision "does not, of course, deprive States or trial judges of the power either to *prevent such argument entirely* or to *provide juries*

and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his

favor, and to have the Assistance of Counsel for his defense.
U.S. Const. amend. VI.

*with instructions that explain the necessity, and the justifications, for the defendant's attendance at trial." Id.* (emphasis added).

The *Portuondo* dissent characterized the majority's holding as "transform[ing] a defendant's presence at trial from a Sixth Amendment right into an automatic burden on his credibility." *Id.* at 76, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.). Justice Ginsburg relied upon that court's earlier decisions in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which held that a defendant's refusal to testify at trial may not be used as evidence of his guilt, and *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), holding that a defendant's silence after receiving Miranda warnings did not warrant a prosecutor's attack on his credibility. Based on those cases, Justice Ginsburg contended that, "where the exercise of constitutional rights is 'insolubly ambiguous' as between innocence and guilt, a prosecutor may not unfairly encumber those rights by urging the jury to construe the ambiguity against the defendant." *Portuondo*, 529 U.S. at 77, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.). Justice Ginsburg reasoned that, simply because a jury has a "natural or irresistible" inclination to draw the inference that a defendant who testifies has tailored his or her own testimony, "it would not follow that prosecutors could urge juries to draw it." *Id.* at 86, 120 S.Ct. 1119.

Although Justice Ginsburg would have prohibited generic tailoring arguments during summation when the defendant was not able to rebut that argument, her position still allowed for the use of such arguments during cross-examination. *Id.* at 78, 120 S.Ct. 1119. Under Justice Ginsburg's approach, "on cross-examination, a prosecutor would be free to challenge a defendant's overall credibility by pointing out that the defendant had the opportunity to tailor his testimony in general, even if the prosecutor could point to no facts suggesting that the defendant had actually engaged in tailoring." *Id.* Thus, the only limitation on the use of tailoring arguments, according to Justice Ginsburg, is that generic arguments may not be made on summation when the defendant has no opportunity to rebut them. *Id.* Apparently in Justice

Ginsburg's view, specific tailoring arguments are permissible at all stages of the trial. *Id.*

## B.

This court has held that the prosecution is permitted to attack a defendant's credibility. *See Apilando*, 79 Hawai'i at 142, 900 P.2d at 149. In *Apilando*, the prosecutor argued to the jury that "because Apilando had the highest stake in the outcome of the case, he had the greatest motive to lie." *Id.* It was held that the comments were not improper because "when a defendant takes the stand to testify, his or her credibility can be tested in the same manner as any other witness." *Id.* (citing *State v. Pokini*, 57 Haw. 17, 22, 548 P.2d 1397, 1400 (1976)); *see also State v. Clark*, 83 Hawai'i 289, 305, 926 P.2d 194, 210 (1996) (holding that the prosecutor's argument in closing that "[w]hen the defendant comes in here and tells you that he was not on cocaine that night, that just—it's a cockamamie story[,]" was a permissible attack on the defendant's credibility). However, prosecutors are prohibited from making comments that infringe upon a defendant's constitutional rights. *State v. Wakisaka*, 102 Hawai'i 504, 515, 78 P.3d 317, 328 (2003).

## VII.

## A.

This court may afford greater protection under the state constitution than that required by the federal constitution "when the United States Supreme Court's interpretation of a provision present in both the United States and Hawai'i Constitutions does not adequately preserve the rights and interests sought to be protected[.]" *State v. Bowe*, 77 Hawai'i 51, 57, 881 P.2d 538, 544 (1994) (internal quotation marks, citations, and brackets omitted). Because it appears that neither the *Portuondo* majority nor dissent affords adequate protection for the constitutional rights to be present at trial, to confront witnesses, to present witnesses, and to testify, *see Bowe*, 77 Hawai'i at 57, 881 P.2d at 544, this court should adopt a standard under the Hawai'i Constitution, as Justice Stevens suggests, that would prohib-

it the prosecution from "entirely" making arguments that a defendant tailored his or her testimony.

### B.

Other state courts have concluded that prosecutors' comments regarding a defendant's trial presence do infringe upon the right to confrontation. *See, e.g., Daniels,* 861 A.2d at 819; *Hart v. United States,* 538 A.2d 1146, 1149 (D.C.App.1988); *State v. Hemingway,* 148 Vt. 90, 528 A.2d 746, 748 (1987). These courts have prohibited generic tailoring comments in closing arguments by the prosecution which invite the jury to draw inferences based simply upon the defendant's presence at trial.

### 1.

In *Hemingway,* the prosecutor argued in closing argument that the defendant had

> the opportunity, unlike any other witness, to sit here and hear all the other evidence. So therefore he has a chance to hear all the evidence, fill in gaps, *modify testimony he desires to, to fit any contingency, any discrepancy, that might come up here;* so I'd like to think that after you look at all the evidence you'll come back with a guilty verdict.

528 A.2d at 747 (ellipsis omitted) (emphases added). The Vermont Supreme Court held that, although "[t]he defendant's credibility is [ ] a proper subject for comment[,]" "[i]n this case, ... the State's comment on the defendant's credibility in its closing argument strayed beyond the confines of the evidence presented at trial[,]" and was therefore improper. *Id.* at 748. That court noted that the tailoring argument was presented on rebuttal argument, at a point when the defendant could not respond, and that nothing in the record supported such an argument.

> [T]he State argued in closing that the defendant corrected his description of the route taken before the traffic stop to ensure that his testimony conformed with his friend's statement. Standing alone this argument would not have been improper, as it was an inference drawn directly from the evidence. *The State, however, went beyond casting this doubt about the sub-*

*stance of the defendant's testimony, and asked the jury to infer the defendant's lack of credibility from the manner in which he presented his testimony. ...* [T]his innuendo was introduced in conclusory form during rebuttal argument, without evidentiary support in the record, and at a point when the defendant could not respond other than by an objection. There was no testimony that the defendant and his friend had collaborated, or that the defendant purposefully used the timing of his testimony to ensure his story coincided with that of his friend. This correction did not follow additional testimony by the friend, rather, defendant's direct and redirect examination both *followed* the friend's testimony. The State's inference that the defendant placed himself in the position to "fill in gaps" thus was not drawn from the testimony, and was improper.

*Id.* (first emphasis added) (second emphasis in original). *Hemingway* concluded that it was insufficient that the court "generally charged the jury with assessing the credibility of the witnesses," and the error was not harmless because the "determination [of guilt] turned on the jury's assessment of the credibility of the respective witnesses, and its ability to consider the prosecutor's improper comment on the defendant's credibility *must be seen as having tainted those deliberations." Id.* (emphasis added).

### 2.

In *Daniels,* the New Jersey Supreme Court reversed the defendant's conviction and remanded for a new trial based upon the prosecutor's improper "suggest[ion] during summation that [the] defendant tailored his testimony to meet the facts testified to by other witnesses." 861 A.2d at 811. The defendant in *Daniels* was convicted of second degree robbery. At trial, evidence was adduced that the defendant was driving a vehicle that had been used in a robbery and that the vehicle still contained the stolen property when he was arrested by police. *Id.* The defendant denied involvement in the robbery, testifying that he had been met by his friends earlier on the day of the robbery who then asked him to drive the vehicle, and that

the stolen property was already in the car when police arrested him. *Id.* at 811–12. At defendant's trial, the prosecutor commented on the defendant's presence in the courtroom throughout the receipt of testimony:

Now, I said that the defendant in his testimony is subject to the same kinds of scrutiny as the State's witnesses. But just keep in mind, there is something obvious to you, I'm just restating something you already know, which is all I do in my summation, *the defendant sits with counsel, listens to the entire case and he listens to each one of the State's witness[es], he knows what facts he can't get past.* The fact that he was in the SUV. The fact that there's a purse in the car. The fact that a robbery happened. *But he can choose to craft his version to accommodate those facts.*

*Id.* at 812 (emphases in original).

The appellate court held "that the prosecutor's comments did not meet [the] standard for reversal because they were directed to defendant's credibility as a witness," and "that, by taking the stand, defendant waived his right to remain silent and subjected himself to an attack on his credibility." *Id.* at 813 (internal quotation marks and citations omitted). However, on certiorari, the New Jersey Supreme Court disagreed, recognizing that the defendant is a unique type of witness. "[A] criminal defendant is not simply another witness. Those who face criminal prosecution possess fundamental rights that are essential to a fair trial." *Id.* at 819 (internal quotation marks and citation omitted).

That court explained that "a criminal defendant has the right to be present at trial, to be confronted with the witnesses against him and to hear the State's evidence, ... to present witnesses and evidence in his defense, ... [and] to testify on his own behalf." *Id.* (internal citations omitted). Further, *Daniels* maintained that the "[p]rosecutorial comment suggesting that a defendant tailored his testimony inverts those rights, permitting the prosecutor *to punish the defendant for exercising that which the Constitution guarantees.*" *Id.* (emphasis added). As such, it was conclud-

ed that "[a]lthough, after *Portuondo,* prosecutorial accusations of tailoring are permissible under the Federal Constitution, *we nonetheless find that they undermine the core principle of our criminal justice system—that a defendant is entitled to a fair trial.*" *Id.* (emphasis added).

*Daniels* stated, "We agree with Justice Stevens that generic accusations of tailoring debase the 'truth-seeking function of the adversary process,' violate the 'respect for the defendant's individual dignity,' and ignore 'the presumption of innocence that survives until a guilty verdict is returned.'" *Id.* (quoting *Portuondo,* 529 U.S. at 76, 120 S.Ct. 1119 (Stevens, J., concurring, joined by Breyer, J.)). According to *Daniels,* "[w]e simply cannot conclude that generic accusations are a legitimate means to bring about a just conviction. Therefore, pursuant to our supervisory authority, we hold that prosecutors are prohibited from making generic accusations of tailoring during summation." *Id.* (internal quotation marks and citation omitted).

In so concluding, *Daniels* set forth a rule that prohibits prosecutors from presenting tailoring arguments to the jury. The rule states that "[t]he prosecutor's comments must be based on the evidence in the record and the reasonable inferences drawn therefrom." *Id.* (citation omitted). The prosecution is only free to comment on the evidence supporting the inference of tailoring and "may not refer explicitly to the fact that the defendant was in the courtroom or that he heard the testimony of other witnesses, and was thus able to tailor his testimony." *Id.*

### C.

As noted before, in final argument the prosecutor in this case stated that

[Petitioner] told you he lied before. *He had a chance to sit through the evidence. He had to make his story gibe with what you've heard. What is in evidence.* What [Val] even had to admit to, because she—
...

*He sat through the evidence.* There is a 911 tape. [Val's] statement. Joey's statement. Based on all that, he is not telling

the truth. All of a sudden he remembered that he grabbed the knife.

(Emphases added.) While it was permissible for the prosecutor to point out that Petitioner's statements conflicted with those of the other witnesses, that Petitioner's trial testimony conflicted with his prior statement, and also that Petitioner admitted that he had lied previously, the prosecutor's general statements directly attacking Petitioner's presence at trial, and his concomitant ability therefore to "make his story gibe" wrongly infringed on Petitioner's rights to be present at trial and to testify. The prosecution's argument did not merely "state, discuss, and comment on the evidence as well as [ ] draw all reasonable inferences from the evidence[,]" *Clark*, 83 Hawai'i at 304, 926 P.2d at 209, but constituted a direct attack on the exercise of Petitioner's confrontation right.

As stated previously, under the *Daniels* rule, "the prosecutor may not refer explicitly to the fact that the defendant was in the courtroom or that he heard the testimony of other witnesses, and was thus able to tailor his testimony." *Daniels*, 861 A.2d at 819. The standard applied in *Hemingway* and *Daniels* is necessary to adequately protect the constitutional rights incident to being present and to testifying at trial, while still allowing the prosecution leeway to comment directly on the evidence presented. Therefore, the prosecution's accusations of tailoring during summation violated Petitioner's constitutional right of confrontation.

## VIII.

### A.

The majority criticizes the *Portuondo* majority's decision because under such a rule "the prosecution can permissibly make a comment that is related *only* to the defendant's presence in the courtroom and not to his actual testimony." Majority opinion at 325, 226 P.3d at 495 (citing *Portuondo*, 529 U.S. at 73, 120 S.Ct. 1119) (emphasis in original). However, this ignores the fact that Justice Ginsburg's dissent allows tailoring questions and comments to be presented at other stages of trial. Under this approach, prosecutors are allowed to (1) present "ge-neric" accusations of tailoring at trial so long as that argument is presented on cross-examination while a defendant has the opportunity to rebut such an argument or (2) "at any stage of a trial to accuse a defendant of tailoring specific elements of his testimony[.]" *Portuondo*, 529 U.S. at 78, 120 S.Ct. 1119.

Justice Ginsburg's justification for allowing generic tailoring questions on cross examination is as follows:

> The truth-seeking function of trials may be served by permitting prosecutors to make accusations of tailoring—even wholly generic accusations of tailoring—as part of cross-examination. Some defendants no doubt do give false testimony calculated to fit with the testimony they hear from other witnesses. *If accused on cross-examination of having tailored their testimony, those defendants might display signals of untrustworthiness that it is the province of the jury to detect and interpret.* But when a generic argument is offered on summation, it cannot in the slightest degree distinguish the guilty from the innocent. It *undermines all defendants equally* and therefore does not help answer the question that is the essence of a trial's search for truth: Is this particular defendant lying to cover his guilt or truthfully narrating his innocence?

*Id.* at 79, 120 S.Ct. 1119 (Ginsburg, dissenting, joined by Souter, J.) (emphases added). But Justice Ginsburg's arguments against accusations of tailoring in summation are just as applicable to accusations during cross-examination because they "undermine[ ] all defendants [who choose to testify,] equally[.]" *Id.* It does not logically follow that because a defendant is able to respond to an accusation of tailoring during cross-examination, that the accusation is warranted or will enable the jury to better assess the defendant's credibility.

In that regard, the *Daniels* court also discussed whether it was permissible for a prosecutor's cross-examination to refer to a defendant's presence at trial, stating that, "[a]lthough not raised by defendant at trial or before this [c]ourt, we recognize that both trial courts and litigants may have questions

342

as to whether, and to what extent, our opinion concerning prosecutorial summation applies to cross-examination by the State." *Daniels*, 861 A.2d at 820. Thus, that court declared that, "[f]or future guidance, *the same analysis that we have provided for summations applies also to cross-examination.* The foundational principle in that framework is that a prosecutor must have reasonable grounds for posing questions during cross-examination that impugn a witness's credibility." *Id.* (internal quotation marks and citation omitted) (emphasis added).

*Daniels* reiterated that "if there is evidence in the record that a defendant tailored his testimony, the prosecutor may cross-examine the defendant based on that evidence. However, at no time during cross-examination may the prosecutor reference the defendant's attendance at trial or his ability to hear the testimony of preceding witnesses." *Id.* Thus, *Daniels* rejected the notion raised in Justice Ginsburg's dissent that the jury is

aided by allowing reference to a defendant's presence at trial during cross-examination.

### B.

In the instant case, on cross-examination the prosecution commented on Petitioner's ability to listen to the testimony of the witnesses. The prosecutor asked Petitioner whether his memory of the events was better at trial than when he gave his statement to the police because he had been able to sit through trial and see the evidence against him, implying that Petitioner was tailoring his testimony.[6] These questions by the prosecutor are an example of a specific tailoring comment inasmuch as they were made in the context of Petitioner having given a different account of the events at trial than the one he gave to police after being arrested. As stated previously, the approach of Justice Ginsburg adopted by the majority allows prosecutors on cross-examination or "at any stage of the trial to accuse a defendant of tailoring specific elements of his testimony[.]" *Portuondo*, 529 U.S. at 78, 120 S.Ct. 1119 (Gins-

---

6. In his opening brief, Petitioner argued that the prosecutor's statements on both cross-examination and summation infringed upon his right to confront witnesses and testify under the Hawai'i Constitution. But in his Application, Petitioner did not raise this argument with respect to cross-examination. To limit discussion of tailoring comments to the prosecutor's summation only, however, would defeat the purpose of prohibiting tailoring comments. The effect of such a prohibition on summation would be rendered meaningless if tailoring questions or comments were condoned during other stages of the trial. As the New Jersey Supreme Court observed in *Daniels*, although the matter of cross-examination was not before it, it was necessary that that court set forth a rule *entirely* prohibiting tailoring comments during cross-examination pursuant to its supervisory powers over lower courts in order to adequately protect the right of confrontation. *Daniels*, 861 A.2d at 819.

Similarly, this court could recognize plain error with respect to cross-examination. *See, e.g., State v. McGriff*, 76 Hawai'i 148, 155, 871 P.2d 782, 789 (1994) (citing Hawai'i Rules of Appellate Procedure 28(b)(4)) (explaining that, although this court was "not obligated to consider the 'points of error' purportedly raised on appeal[,]" it would examine the admission of evidence at trial under the plain error standard); *State v. Grindles*, 70 Haw. 528, 530, 777 P.2d 1187, 1189 (1989) (stating that this court has " 'the power to *sua sponte* notice plain errors or defects affecting substantial rights' " and ad-

dressing a due process claim that "Appellant did not raise on appeal") (quoting *State v. Hernandez*, 61 Haw. 475, 482, 605 P.2d 75, 79 (1980)). Or this court could invoke its supervisory power to cover the various permutations of tailoring comments, as the New Jersey Supreme Court did in *Daniels*. *See, e.g., State v. Wilson*, 92 Hawai'i 45, 54–55, 987 P.2d 268, 277–78 (1999) (recognizing that courts have " 'inherent supervisory power to curb abuses and promote a fair process which extends to the preclusion of evidence' " and holding that "the illegally obtained evidence 'must be suppressed under the authority of this court's supervisory powers in the administration of criminal justice in the courts of our state.' " (quoting *State v. Pattioay*, 78 Hawai'i 455, 468 n. 28, 469, 896 P.2d 911, 924 n. 28, 925 (1995))); *State v. Ito*, 85 Hawai'i 44, 48, 936 P.2d 1292, 1296 (1997) ("The supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law.") (Quoting HRS § 602–4 (1993).); *see also State v. Moniz*, 69 Haw. 370, 373–74, 742 P.2d 373, 376 (1987) (invoking supervisory power over lower courts because existence of potential danger to public and conflict in interpretations of statute by lower courts constituted compelling circumstances); *State v. Estrada*, 69 Haw. 204, 228, 738 P.2d 812, 828 (1987) (exercising supervisory powers to declare judge's usual practice of personally entering the jury room to answer the jurors' questions improper and prejudicial).

burg, J., dissenting, joined by Souter, J.). Although the majority correctly characterizes the prosecution's tailoring arguments as specific, as opposed to generic, the distinction has little practical value inasmuch as the approaches of both the majority and dissent in *Portuondo* afford no meaningful protection of a criminal defendant's constitutional right to confrontation.

In that regard, the prosecution was free to refer to the specific inconsistencies in Petitioner's testimony without referring to his presence at trial. The only explanation offered by the *Portuondo* dissent and, thus, the majority in this case for allowing specific tailoring arguments, is that a jury may find it useful to observe a defendant's demeanor when he or she is accused of tailoring because he or she "might display signals of untrustworthiness." *Id.* at 79, 120 S.Ct. 1119. As *Daniels* recognized, even in cases where there are no inconsistencies, the "close or perfect symmetry between a defendant's testimony and other witnesses' testimony, or other evidence of tailoring, may prompt the jury's scrutiny." 861 A.2d at 820. Because prosecutors may already cite to specific facts indicating a defendant's lack of trustworthiness and a defendant whose testimony perfectly matches that of other witnesses may be regarded with suspicion by the jury, there is no reasonable justification for placing a tailoring burden on a defendant.

Moreover, the notion that generic accusations serve a "truth-seeking function" is unconvincing. By their nature, "generic" accusations apply to all defendants and do nothing to illumine the specific facts of a case, regardless of the stage of trial at which they are presented, be it at cross-examination or in closing argument. The adoption of such an approach by the majority in this case will only encourage generic accusations inasmuch as there is no prohibition against doing so on cross-examination or at other stages of the trial. As discussed *supra*, adopting the position of the *Portuondo* dissent does not afford adequate protection under the confrontation clause inasmuch as the majority's rule in allowing tailoring comments in other parts of the tri-al affords no realistic protection of confrontation rights.

## IX.

### A.

In *Daniels,* the trial court gave the jury a standard instruction that "[a]ny arguments, statements, remarks in the opening or summations of counsel are not evidence and must not be treated by you as evidence." 861 A.2d at 821. *Daniels* concluded that this instruction did not suffice to cure the harm of the prosecutor's comments because the instruction "made no mention of the prosecutor's accusations of tailoring." *Id.*

To reiterate, Justice Stevens noted in his concurring opinion in *Portuondo* that, "[t]he Court's final conclusion ... does not, of course, deprive States or trial judges of the power [ ] to ... provide juries with instructions that explain the necessity, and the justifications, for the defendant's attendance at trial." *Portuondo,* 529 U.S. at 76, 120 S.Ct. 1119 (Stevens, J., concurring, joined by Breyer, J.); *see also Teoume–Lessane v. United States,* 931 A.2d 478, 495 n. 14 (D.C.2007) (noting that "[u]pon request, a trial judge may instruct the jury that a defendant has a constitutional right to be present throughout his/her trial"); *State v. Alexander,* 254 Conn. 290, 755 A.2d 868, 874 n. 10 (2000) (noting that "[i]t may be necessary in particular circumstances for a trial court to remind a jury of a defendant's constitutional right to be present at trial"); *State v. Rose,* 622 A.2d 78, 79 (Me.1993) (disapproving of the prosecutor's remarks, but declining to reverse where the defendant failed to move for a new trial and "the court instructed the jury that [the defendant] had 'an absolute legal right afforded all defendants by law to be present through the entire trial and to review any reports that the State may have generated' ") (ellipses omitted); *State v. Buscham,* 360 N.J.Super. 346, 823 A.2d 71, 83 (A.D.2003) (noting that "the trial court might have been advised, in light of the [prosecutor's] comment, to instruct the jury as to a defendant's right to be present during the entire course of the trial," but declining to recognize plain error where there was no objection to the

comments); *Hemingway*, 528 A.2d at 747 (holding that general instruction as to assessing credibility of witnesses was insufficient to cure taint from prosecutor's comments); *cf. Maez v. State*, 530 N.E.2d 1203, 1208 (Ind.Ct. App.1988) (concluding, as to whether court's instruction on the defendant's right not to testify was appropriate, that "[h]ere, Maez was not present at trial[, and t]hat fact was obvious to those who were present[, therefore, u]nder these circumstances, we agree with the State's contention that *the jury had to have some guidance in the matter* ") (emphasis added).

### B.

This court should also require that the jury be instructed as to a defendant's right to be present throughout the trial. Although in the instant case the court instructed the jury that statements made by the prosecutor "were not to be considered evidence and that the jury was not bound by counsel's recollections or interpretations[,]" this instruction failed to address the tailoring statements and to notify the jury that Petitioner had both a right and legal duty to be present at trial.

Such an instruction is warranted where a defendant opts to exercise his right to testify because, as recognized by the *Portuondo* majority, "it is natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to have in mind and weigh in the balance the fact that he heard the testimony of all those who preceded him." *Portuondo*, 529 U.S. at 67–68, 120 S.Ct. 1119 (emphasis omitted). Such an inference is improper, inasmuch as the defendant has a right to testify. *Cf. State v. Mainaaupo*, 117 Hawai'i 235, 254, 178 P.3d 1, 20 (2008) (holding that the prosecutor's argument in favor of an "*unreasonable inference* that [the defendant] was guilty in light of his post-arrest silence" "were not legitimate because[ ] [it] contraven[ed] the defendant's] fundamental right to remain silent") (quotation marks omitted) (emphasis added); *State v. Horne*, 376 N.J.Super. 201, 869 A.2d 955, 961 (A.D.2005) (holding that "a jury *may not[ ] infer guilt* based on a defendant not testifying at trial") (emphasis added).

Thus, when the defendant testifies at trial, in conjunction with the general instruction as to the jury's ability to adjudge the witnesses' credibility, a defendant is entitled to an instruction indicating that a defendant has a constitutional right to be present throughout trial and while other witnesses are testifying, and that the jury must not draw any unfavorable inference regarding the credibility of the defendant simply on the basis of the defendant's presence at trial.

### X.

While not determinative of the constitutional right to confront and testify, Petitioner had not only a constitutional right to be at trial, but a legal duty to be present. Hawai'i Rules of Penal Procedure (HRPP) Rule 43 (2008) provides in relevant part:

(a) Presence Required. *The defendant shall be present at the arraignment, at the time of the plea, at evidentiary pretrial hearings, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.*

(b) Continued Presence Not Required. The further progress of a pretrial evidentiary hearing or of the trial to and including the return of the verdict shall not be prevented and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present,

(1) *is voluntarily absent* after the hearing or trial has commenced (whether or not the defendant has been informed by the court of the obligation to remain during the trial); or

(2) engages in conduct which is such as to justify exclusion from the courtroom.

. . . .

(d) Presence May be Waived. In prosecutions *for offenses other than a felony*, the court may:

(1) conduct arraignment, accept a plea of not guilty, or conduct an evidentiary pretrial hearing in the defendant's absence, provided the defendant consents

in writing or the defendant's counsel orally represents that the defendant consents.

(Emphases added.) Manifestly, HRPP Rule 43 requires persons charged with a felony to be present at all stages of the trial. Petitioner was charged with a class C felony. Thus, Petitioner was required by law to be present during trial.

This requirement compounds the burden that the majority's ruling in the instant case places on the right of confrontation. By court rule defendants must be present at trial. Yet mandated presence becomes a detriment to a defendant because the prosecution is free to impugn his credibility should he choose to testify on his own behalf.

## XI.

### A.

In examining whether the prosecutor's comments were so prejudicial as to warrant vacating Petitioner's conviction, this court considers the nature of the conduct, the promptness of a curative instruction, and the weight of the evidence against Petitioner. *See Maluia*, 107 Hawai'i at 24, 108 P.3d at 978. In this case, all three of those factors weigh in favor of vacation.

First, the prosecutor's conduct was particularly concerning. Although this court has allowed the prosecution wide latitude in closing remarks, this leeway pertains only to comments upon the evidence and not to direct attacks on a defendant's constitutional rights. In *Clark*, this court stated that

> a prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence.

83 Hawai'i at 304–05, 926 P.2d at 209–10. Under Hawai'i law, the prosecution, then, is permitted to discuss the evidence and inferences from the evidence. As noted before, however, a prosecutor's comments may not infringe on a defendant's constitutional rights. *See Wakisaka*, 102 Hawai'i at 515, 78 P.3d at 328.

In *Wakisaka*, this court held that, "[a]s a rule, the prosecution cannot comment on the defendant's failure to testify because this infringes on the defendant's right not to be a witness against her- or himself." *Id.* (citing Haw. Const. art. I, § 10). With regard to the prosecutor's comments during the rebuttal argument in that case, this court stated that

> [the defendant] did not testify in his own defense. During rebuttal argument, the prosecution stated: "Who was alone with her? He was alone with her. He was there. *He would know. If he doesn't tell us, we can only look to Shirlene and see what her body tells us.*" [The defendant's] counsel did not object to these statements, and the court did not *sua sponte* give a curative instruction.

*Id.* at 513, 78 P.3d at 326 (emphasis added). It was concluded that the prosecution's comments in that case were improper because they intentionally led the jury to draw the inferences that the defendant had something to hide simply from the defendant's exercise of his right against self incrimination.

> By reminding the jury that [the defendant] did not testify, and by implying that [the defendant] had information he was withholding from the jury, the prosecution manifestly intended the jury to note that [the defendant] did not testify; furthermore, *given the language used, the jury would naturally and necessarily interpret the prosecution's rebuttal argument as a comment on [the defendant]'s failure to testify.*

*Id.* at 516, 78 P.3d at 329 (emphasis added). Consequently, if a prosecutor's comments infringe on a defendant's constitutional rights, those comments may amount to prosecutorial misconduct. In *Wakisaka*, the comments were not harmless beyond a reasonable doubt, because, (1) "no curative instruction was given" and (2) "the evidence was not so overwhelming that we are convinced the prosecution's intrusion on [the defendant's] rights under article I, section 10 of the Hawai'i Constitution may not have contributed to [the defendant's] conviction." *Id.* Thus,

this court concluded that the defendant was "entitled to a new trial as a result of the prosecutorial misconduct[.]" *Id.*

Second, applying *Maluia*, no curative instruction was given. Indeed the error was compounded because the court overruled Petitioner's objections to this line of questioning during cross-examination, as well as to the prosecutor's comments made in the closing argument, leaving the jury with the incorrect impression that Petitioner's presence at trial may be sufficient to discredit his testimony.

As to the weight of the evidence, this case turns on credibility, as the testimony of the three primary witnesses was in conflict. Petitioner was the only witness for the defense. The prosecutor's comments on tailoring were particularly harmful to Petitioner, especially in light of the fact that the credibility of the adverse witnesses rested on accounts of the events that conflicted with their own prior statements and that of others. For example, Val testified that she saw Joey loading his gun, but Joey testified that he did not load his gun. Nor did Joey disclose his threats to use a gun in his initial discussion with the police, and also changed his story in regard to whether Petitioner had asked him to leave prior to threatening him with a knife. Val changed her account of the incident, first indicating that Petitioner did swing the knife at Joey, but later testifying that Petitioner did not swing the knife at Joey. Val also testified that, when she prepared her written statement, she only included those facts that Joey had mentioned and that her statement was based on Joey's statement. These inconsistencies highlight the important role that credibility played in the jury's determination of guilt.

In such a case, especially where Petitioner was the only defense witness, the prosecution's statements infected the entirety of Petitioner's testimony, therefore, there is a reasonable possibility, absent the improper comments, the jury would have believed Petitioner's version of the facts, and thus, the result might have been different. As in *Wakisaka*, "the evidence was not so overwhelming [that] ... the prosecution's intrusion on [Petitioner's] rights under article I, section[s 5, 10 and 14] of the Hawai'i Consti-

tution may not have contributed to [Petitioner's] conviction." 102 Hawai'i at 516, 78 P.3d 317, 329.

### B.

However, the prosecutor's statements in this case were not "so egregious" as to bar re-prosecution under the double jeopardy clause, *see Maluia*, 107 Hawai'i at 26, 108 P.3d at 980, especially in light of the fact that there was little precedent available to guide the prosecution on this issue. Thus, retrial would be the appropriate remedy. *See id.*

### XII.

As the Supreme Court of New Jersey stated, "[t]hose who face criminal prosecution possess fundamental rights that are 'essential to a fair trial.'" *Daniels*, 861 A.2d at 819 (quoting *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)). *Daniels* rightly concluded, as noted before, that "[p]rosecutorial comment suggesting that a defendant tailored his testimony inverts those rights, permitting the prosecutor to punish the defendant for exercising that which the Constitution guarantees." *Id.* By limiting arguments to "evidence in the record and the reasonable inferences drawn therefrom[,]" *id.*, the *Daniels* approach prevents burdening the credibility of a defendant simply because he chose to testify.

Under *Maluia*, Petitioner's conviction should be vacated and the case remanded for a new trial in which tailoring comments must be prohibited entirely, with an instruction to be given to the jury that Petitioner has both the constitutional right and statutory obligation to be present at trial. This court should reject an interpretation of a defendant's right to confrontation and to testify under the Hawai'i Constitution that permits accusations of tailoring and presents the defendant with a Hobson's choice of exercising his right to be present at trial and to testify, or sequestering himself in order to prevent the taint of that accusation. Allowing the prosecution to comment upon the defendant's presence as an opportunity to tailor his or her testimony carries significant and even decisive weight in cases where the credibility

of the witnesses is an important issue and, thus, precludes a fair trial.